# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| TOM BAKER, Individually and on behalf of all others similarly situated, | ) ) ) |  |
|  | ) |  |
| Plaintiff(s), | ) |  |
|  | ) |  |
| v. | ) | Cause No. 1:25-cv-00430-TWP-MKK |
|  | ) |  |
|  | ) | <u>CLASS ACTION</u> |
|  | ) |  |
| CUMMINS INC., N. THOMAS LINEBARGER, JENNIFER RUMSEY, and MARK A. SMITH, | ) ) ) | JURY TRIAL DEMANDED |
|  | ) |  |
| Defendant(s). | ) |  |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Richard Kraemer ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Cummins Inc. ("Cummins" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Cummins common stock between February 11, 2019 and December 21,

2023, inclusive (the "Class Period"), and suffered compensable damages thereby (the "Class"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant Cummins, among other things, designs and manufactures diesel engines for RAM 2500 and 3500 trucks. Between 2013 and 2019, Cummins equipped 630,000 of those engines with undisclosed and unauthorized "defeat devices," which reduced the effectiveness of the trucks' emission control systems.

3.      These defeat devices allowed Cummins' engines to pass the U.S. Environmental Protection Agency ("EPA") and the California Air Resources Board's ("CARB") emissions inspections, while secretly emitting illegally high levels of nitrogen oxides ("NOx"), a dangerous pollutant that causes serious health problems.

4.      When the EPA caught other companies engaging in similar conduct, those companies paid huge fines. Volkswagen had to pay a civil penalty of *$1.45 billion* to the United States government in January 2017 for installing defeat devices in 590,000 diesel vehicles. Then, in January 2019 and September 2020, Fiat Chrysler and Daimler agreed to pay civil penalties of $305 million for 100,000 diesel vehicles and $875 million for 250,000 diesel vehicles, respectively.

5.      Despite installing defeat devices in RAM 2500 and 3500 trucks, Cummins told investors that they prohibited the use of defeat devices in all their products, that the EPA and CARB had certified that their engines met current emission requirements, and that they were committed to controlling air emissions.

6.      Additionally, although Cummins disclosed that the EPA and CARB were investigating defeat devices in RAM 2500 and 3500 trucks, Cummins misled investors by first

not disclosing any loss contingency and then only disclosing a $30 million loss contingency for a recall of those trucks. They did this even as the scope of the investigation expanded, and Cummins became aware it needed to recalibrate its emissions systems to meet standards and that the regulators wanted to resolve their investigations by consent decree and civil penalty.

7.    On December 22, 2023, Cummins announced that it was taking a ***$2.04 billion*** charge to resolve the EPA and CARB investigations, including agreeing to pay a ***$1.675 billion*** fine to the EPA, U.S. Department of Justice ("DOJ"), and CARB under the Clean Air Act.

8.    The DOJ issued a statement alleging that Cummins not only installed 630,000 defeat devices in engines for RAM 2500 and 3500 diesel trucks, but also allegedly installed undisclosed auxiliary emission control devices in 330,000 model year 2019 to 2023 RAM 2500 and 3500 pickup truck engines, meaning that Cummins continued to violate the law even after government regulators were investigating it.

9.    The DOJ further stated: "[t]he types of devices we allege that Cummins installed in its engines to cheat federal environmental laws have a significant and harmful impact on people's health and safety" and "defeat devices on some Cummins engines have caused them to produce thousands of tons of excess emissions of nitrogen oxides."

10.    In response to the December 22, 2023 disclosures, Cummins' stock fell by $7.01 per share, or 2.87%, to close at $236.99, harming investors.

11.    On January 10, 2024, the DOJ (on behalf of the EPA) and CARB filed complaints against Cummins and a joint consent decree in federal court. The DOJ alleged that "Cummins knew or should have known" about their Clean Air Act violations and CARB stated that Cummins committed "multiple willful violations."

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

15.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     Lead Plaintiff Kraemer, as set forth in the certification submitted in connection with his lead plaintiff motion, incorporated by reference herein, purchased Cummins common stock during the Class Period and was economically damaged thereby.

17.     Defendant Cummins is incorporated in Indiana and its head office is located at 500 Jackson Street, Columbus, Indiana 47202-3005.

18.     Cummins' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CMI".

19.     Defendant N. Thomas Linebarger ("Linebarger") served as the Company's Chief Executive Officer ("CEO"), from 2012 through August 1, 2022, and Chairman of the Board of Directors (the "Board") from 2012 through August 1, 2023.

4

20.     Defendant Jennifer Rumsey ("Rumsey") became the Company's President and CEO on August 1, 2022, and has served as Chair of the Board since August 1, 2023. Rumsey was previously Cummins' President and Chief Operating Officer and President of Cummins Components Segment.

21.     Defendant Mark A. Smith ("Smith") was appointed Company's Chief Financial Officer on March 21, 2019. Prior to that, he was the Company's Vice President — Financial Operations since 2016. Prior to joining Cummins in 1995, Defendant Smith worked as an accountant.

22.     Defendants Linebarger, Rumsey, and Smith are collectively referred to herein as the "Individual Defendants."

23.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

5

24.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

25.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Cummins under *respondeat superior* and agency principles.

26.     Defendant Cummins and the Individual Defendants are collectively referred to herein as "Defendants."

### SUBSTANTIVE ALLEGATIONS

**A. Background of Cummins.**

27.     Defendant Cummins purports to be a "a global power leader". It "designs, manufactures, distributes and services diesel, natural gas, electric and hybrid powertrains and powertrain-related components including filtration, aftertreatment, turbochargers, fuel systems, controls systems, air handling systems, automated transmissions, axles, drivelines, brakes, suspension systems, electric power generation systems, batteries, electrified power systems, electric powertrains, hydrogen production and fuel cell products."

28.     The engines that Cummins designed and manufactured included the 6.7 liter diesel engines in Model Years 2013 through 2023 RAM 2500 and RAM 3500 pickup trucks.

**B. The Dangers of NOx Pollution.**

29.     The Clean Air Act regulates emissions from diesel engines, such as the 6.7 liter diesel engines that Cummins manufactured for RAM 2500 and 3500 pickup trucks.

30.     Diesel emissions are closely regulated because they are very dangerous. In 2012, the International Agency for Research on Cancer, which is part of the World Health Organization, classified diesel engine exhaust as carcinogenic to humans based on sufficient evidence.

31.     Additionally, NOx from diesel emissions reacts with sunlight leading to the formation of ozone and smog conditions. Exposure to Ozone increases the frequency of asthma attacks and aggravates lung diseases, such as asthma, emphysema, and chronic bronchitis. This leads to increased school absences, medication use, visits to doctors and emergency rooms, and hospital admissions where high-levels of Ozone are present.

32.     Additionally, Ozone is a greenhouse gas that increases global warming.

**C.  The EPA and California Certification Process for Motor Vehicles.**

33.     The EPA administers a certification program to ensure that every new motor vehicle introduced into the United States satisfies applicable emission standards. 42 U.S.C. § 7521. Under this program, the EPA issues Certificates of Conformity ("COCs"). Manufacturers are required to obtain a COC to introduce new motor vehicles into the United States.

34.     To obtain a Certificate of Conformity ("COC"), a manufacturer must submit an application to the EPA for each Model Year and Test Group[1] of new motor vehicles it intends to enter into United States Commerce. 40 C.F.R. § 86.1843-01.

35.      Each COC application must be in writing and signed by an authorized representative of the manufacturer and it must include a statement that the motor vehicles in the Test Group comply with all applicable regulations in 40 C.F.R. Chapter I. 40 C.F.R. § 86.184401(d).

36.     Before a manufacturer can submit a COC application through EPA's Engines and Vehicles Compliance Information System, that system requires the manufacturer to confirm that the Test Group that is the subject of the application complies with the applicable federal emissions

---

[1] A Test Group is comprised of vehicles with similar engine design that are subject to the same emissions standards for pollutants regulated under the Clean Act. *See* 40 C.F.R. §§ 86.1803-01, 86.1827-01(a).

regulations. Motor vehicles are covered by a COC only if the motor vehicles are as described in the manufacturer's application for the COC "in all material respects." 40 C.F.R. § 86.1848-10(c)(6).

37.    Each COC application must include a list of all auxiliary emission control devices ("AECDs") installed on the motor vehicles, as well as a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and a rationale for why it is not a defeat device. 40 C.F.R. § 86.1844-01(d)(11).

38.    An AECD is "any element of design which senses temperature, vehicle speed, engine [revolutions per minute], transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 C.F.R. § 86.1803-01.

39.    A "defeat device" is an AECD that "reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless: (1) Such conditions are substantially included in the [Federal emission test procedures]; (2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; (3) The AECD does not go beyond the requirements of engine starting; or (4) The AECD applies only for emergency vehicles . . . ." 40 C.F.R. § 86.1803-01.

40.    An element of design is "any control system (i.e., computer software, electronic control system, emission control system, computer logic), and/or control system calibrations, and/or the results of systems interaction, and/or hardware items on a motor vehicle or motor vehicle engine." 40 C.F.R. § 86.1803-01.

41.    A new motor vehicle containing an AECD that is not disclosed in the COC

application does not conform in all material respects with the COC application and, therefore, is not covered by the COC.

42.     Federal law prohibits new motor vehicles from being equipped with defeat devices. 40 C.F.R. § 86.1809-12.

43.     Additionally, Section 203(a)(1) of the Clean Air Act prohibits manufacturers of new motor vehicles from selling, offering for sale, introducing into commerce, or delivering for introduction into commerce, or any person from importing into the United States, any new motor vehicle not covered by a COC issued by EPA under regulations prescribed under the Act governing motor vehicle emission standards. 40 C.F.R. § 86.1854-12(a)(1)

44.     Section 203(a)(3)(A) of the Clean Air Act, 42 U.S.C. § 7522(a)(3)(A), makes it a violation "for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under [Title II of the Act] prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser." *See* 40 C.F.R. § 86.1854-12(a)(3)(i).

45.     Section 203(a)(3)(B) of the Clean Air Act, 42 U.S.C. § 7522(a)(3)(B), makes it a violation "for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under [Title II of the Act], and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." *See also* 40 C.F.R. § 86.185412(a)(3)(ii).

46.     Similarly, the California Health and Safety Code §43102 requires that each make and model year of vehicle comply with California's emissions standards and be certified by CARB before being offered for sale in the state.

47.     California regulations also (*see* Cal. Code Regs., tit. 13, § 1961(d) and Cal. Code Regs., tit. 13, § 1961(d)) require manufactures to list all AECDs installed on their vehicles, including a justification for each AECD, the parameters the AECDs sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and a rationale for why the AECD is not a defeat device. The regulations also prohibit defeat devices in any new vehicles.

### D.  Tradeoffs Between Emissions and Power in Diesel Engines and Cummins' History of Skirting NOx Emissions Standards.

48.     Despite the dangers of NOx emissions, manufacturers of diesel engines are motivated to evade emissions regulations because there is a tradeoff between power, fuel efficiency, and emissions. Higher combustion temperatures in diesel engines leads to both greater power and fuel efficiency and greater NOx emissions.

49.     Accordingly, it is not surprising that Cummins and other manufacturers have a history of skirting emissions NOx emissions standards.

50.     In 1998, the DOJ and EPA entered into a consent decree under the Clean Air Act with Cummins and other diesel engine manufacturers for deliberately deactivating emissions controls during highway driving and allowing their engines to emit up to three times the maximum allowed NOx pollution (the "1998 Consent Decree"). The EPA fined Cummins and the others $83.4 million and the manufacturers agreed to spend more than $1 billion to correct the problem.

51.     Cummins admitted to violating the 1998 Consent Decree in September of 2006 when it admitted, in a consent decree violation agreement, to installing illegal AECDs in 11,600

engines, which resulted in excess admissions of 979 tons of NOx. Cummins again admitted to violating the 1998 Consent Decree in October 2006 and November 2010.

52.    In 2016, a consumer class action (the "2016 Consumer Class Action")[2] was filed against Cummins concerning excess NOx emissions from the engines of the 2007 to 2012 models of Cummins' RAM 2500 and 3500 RAM trucks (earlier models of the same trucks at issue in this case). The plaintiffs in the 2016 Consumer Class Action pled in an amended complaint filed on May 14, 2018 that they did their own emissions testing under real world conditions and concluded that the trucks did not meet the Clean Air Act's NOx emissions standards. According to the plaintiffs, their tests showed that a 2012 model's average emissions were 3.8 times the NOx standard and maximum admissions were 14.9 times the standard. The plaintiffs also tested 2007 (average admission 4.4 times higher) and 2009 (5.3 times higher) models that, similarly, failed NOx emissions standards by large margins.

**E.    Between 2017 Through 2020, Volkswagen, Daimler, and Fiat Chrysler Paid Huge Fines for Installing Defeat Devices in Diesel vehicles, including a $1.45 Billion Penalty for Volkswagen.**

53.    In January 2017, Volkswagen agreed to pay a $1.45 billion penalty to DOJ for violating the Clean Air Act by installing defeat devices in 590,000 diesel vehicles from 2009 to 2016. The defeat devices were computer software that enabled its cars to pass federal emission tests, but allowed Volkswagen's vehicles to exceed NOx emissions standards under real world driving conditions.

54.    Similarly, on January 10, 2019, the DOJ announced that Fiat Chrysler had agreed to pay a $305 million civil penalty for installing defeat devices in 100,000 Diesel vehicles. As with Volkswagen, computer software enabled the vehicles to pass emissions tests, but allowed

---

[2] *See Bledsoe et al v. FCA US LLC et al*, 4:16-cv-14024 (E.D. Mich).

excess NOx emissions during normal driving.

55.    Finally, on September 14, 2020, the DOJ announced that Daimler AG had agreed to pay $875 million in civil penalties for 250,000 diesel vehicles that had undisclosed AECDs and defeat devices programmed into the vehicle emission control software. As with the other cases, the software allowed an increase in NOx emissions above the legal limit during normal driving.

**F. Cummins Bragged About its Emissions Compliance and Commitment to the Environment Throughout the Class Period.**

56.    Throughout the Class Period, Cummins' public filings boasted about Cummins' compliance with emissions standards and commitment to the environment. Cummins's Annual Report on 10-K for the year ended December 31, 2018 ("2018 10-K") stated that Cummins "adher[ed] to all emissions regulations worldwide, ***including prohibiting the use of defeat devices in all of our products***." Cummins also repeatedly stated that the EPA and CARB "have certified that our engines meet the current emission requirements" and boasted about their commitment to controlling "air emissions."

**G. Cummins Disclosed EPA and CARB Investigations into Defeat Devices in RAM 2500 and 3500 RAM trucks, but Stated it Could Not Estimate Their Financial Impact Throughout the Class Period.**

57.    On April 29, 2019, Cummins announced it was reviewing its certification process and compliance with emissions standards following conversations with the EPA and CARB regarding certification for the engines in 2019 RAM Model 2500 and 3500 trucks.

58.    Following that, as the Company admitted, the EPA and CARB continued to investigated defeat devices in the engines that Cummins designed and manufactured for RAM Model 2500 and 3500 trucks for more than four years. During that time, the model years covered by the investigation expanded and Cummins admitted to developing and installing a new calibration for the emission systems of 2019 RAM Model 2500 and 3500 and developing a new

calibration for the emissions systems of the 2013 to 2018 Models for a recall of those trucks. (*see* Paragraphs 121-123, below). Furthermore, by early 2023, the Company became aware that consent decrees may be necessary to resolve the investigations. (Paragraph 124, below). Nevertheless, prior to Cummins' December 22, 2023 announcement that it was taking a $2.04 billion charge to resolve the investigations, including a $1.675 billion penalty, it accrued only a $30 million loss contingency for the expected recall for RAM 2500 and RAM 3500 engines and nothing for a penalty for them. (Paragraphs 123-124, below).

**H. The EPA and CARB found that Cummins Knowingly Put Defeat Devices in 630,000 Engines Installed in Model Year 2013-2019 RAM 2500 and RAM 3500 trucks and Continued to Fail to Disclose AECDs in Later Models After Those Agencies Were Already Investigating Them.**

59.     On January 10, 2024, the EPA (through the United States Department of Justice) and CARB (through the California Attorney General) filed Complaints against Cummins in the United States District Court for the District of Columbia.[3] The DOJ and CARB Complaints detailed how Cummins fraudulently obtained regulatory approvals by failing to disclose AECDs, including ones that were defeat devices.

1)     The DOJ's Complaint.

60.     The DOJ Complaint alleged that Cummins violated the Clean Air Act through its production and sale of diesel motor vehicle engines that were installed in nearly one million pickup trucks sold in the United States between 2013 and 2023 under the RAM 2500 and RAM 3500 model names (the "Subject Vehicles"). Cummins' applications for COCs for the Subject Vehicles did not disclose multiple software-based features that affected the Subject Vehicles' emission control system.

---

[3] See *United States v. Cummins Inc.*, 24-cv-00088 (D.D.C.), ECF No. 1 ("DOJ Complaint"); *State of California v. Cummins, Inc.*, 24-cv-00090 (D.D.C.), ECF No. 1 ("CARB Complaint"). The cases were then consolidated under the case number 24-cv-00088.

61.     The DOJ further found these undisclosed software features, alone or in combination with one or more of the others, bypassed, defeated and/or render inoperative emission control systems in more than 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks, causing those vehicles to emit substantially higher levels of nitrogen oxides ("NOx") during certain normal real world driving conditions, as compared to the vehicles' NOx emissions levels during federal emission tests.

   a)   Cummins Submitted COC Applications for the Subject Vehicles.

62.     Before their sale to ultimate purchasers, the Subject Vehicles were "new motor vehicles" as defined by Section 216(3) of the Act. 42 U.S.C. § 7550(3).

63.     For each Subject Vehicle Test Group, Cummins submitted to EPA an application for a COC.

64.     As a part of the COC application process for the Subject Vehicles, Cummins submitted lists of AECDs through EPA's EV-CIS system[4] for each Test Group.

65.     Cummins performed engine calibrations, including calibrations involving AECDs, for the Subject Vehicles.

66.     While Cummins was logged into EPA's EV-CIS system to submit COC application information for the Subject Vehicles, Cummins made entries in that system representing that the Subject Vehicles complied with the applicable emissions regulations, including those in 40 C.F.R. Part 86.

---

[4] Manufacturers may submit COC applications electronically through EPA's Engines and Vehicles Compliance Information System, known as the "EV-CIS System." Before a manufacturer can submit a COC application through EV-CIS, the system requires the manufacturer to confirm that the Test Group that is the subject of the application complies with the applicable federal emissions regulations.

67.     Each application for a COC constitutes a "report [and/or] information the Administrator may reasonably require . . ." to assess compliance with the Act, within the meaning of Section 208(a) of the Act, 42 U.S.C. § 7542(a).

b)  Cummins Failed to Disclose AECDs in Their COCs for the Subject Vehicles.

68.     The engines of the Subject Vehicles purportedly contained two types of emissions control systems for NOx emissions.

69.     Engine control systems reduce NOx by employing strategies to reduce the amount of NOx that is formed in the vehicle engine during combustion. The subject vehicles contained an Exhaust Gas Recirculation ("EGR") engine control system, which by recirculating a portion of the exhaust gas to the combustion chamber lowers the peak combustion temperature of and the oxygen concentration in that chamber, which reduces the formation of NOx in the engine.

70.     After-treatment systems remove NOx from the exhaust after combustion but prior to emission from the tailpipe of the motor vehicle. The Subject Vehicles contained a Selective Catalytic Reduction ("SCR") system, which injects a urea solution into the exhaust stream in order to produce a chemical reaction to reduce NOx to nitrogen and water.

71.     The Subject Vehicles' engines were also equipped with electronic control modules ("ECMs") that control functions in the motor vehicles using software. For each function, such as the rate of fuel injected into the engine, the software includes algorithms that process inputs, such as engine speed or ambient temperature, to the ECM and send messages to the components of the engine to perform certain actions depending on those inputs.

72.     ECM software includes a large number of variables that can be set by the manufacturer, and which define the thresholds or other values used in the software algorithms. Manufacturers calibrate these individual software variables to establish, among other things, the

motor vehicle's emissions performance. The collection of all of the manufacturer-selected values is referred to as the calibration.

73.    ECM software that senses inputs such as ambient temperature, engine speed, or duration of engine operation and then sends a message to control the operation of a component of the emission control system in the motor vehicle is an AECD within the meaning of 40 C.F.R. § 86.1803-01.

74.    The DOJ found that during federal emissions testing, including the test cycle generally known as the Federal Test Procedure and other test cycles used for emission testing required to obtain a COC (collectively, the "Federal Emission Tests"), the Subject vehicles ECM operated the Subject Vehicles' systems so it  produced emission results compliant with the Clean Air Act's emission standards.

75.    In contrast, the DOJ found that during normal vehicle operations AECDs that were installed as part the ECM's software functions and calibrations for more than 630,000 2013-2019 RAMs "*cause[d] a reduction in the effectiveness of the emission control system, including the after-treatment control system, resulting in increased NOx emissions*." (emphasis added).

76.    The  AECDs referenced in the previous paragraph "*were not disclosed in the COC applications for the 2013-2019 RAMs*." (emphasis added).

77.    The DOJ also found that more than 330,000 2019-2023 RAMs also contained AECDs that were not disclosed in their COC applications.

78.     Since "[e]ach undisclosed AECD was a design specification of the manufactured Subject Vehicles that differs in material respects from the description of the Subject Vehicles in their COC applications," "[t]he Subject Vehicles therefore are not covered by a COC."

c) <u>The AECDs in the 2013-2019 RAMs Were Defeat Devices.</u>

79.    The DOJ found the undisclosed AECDs in the 2013-2019 RAMs were defeat devices because "[w]hen engaged individually, or in combination…[they had] a principal effect of bypassing, defeating, or rendering inoperative engine control systems and/or after-treatment control systems installed in those vehicles" and "remove[d] or render[ed] inoperative engine control systems and/or after-treatment control systems installed in the Subject Vehicles."

80.    The DOJ further determined that "***Cummins knew or should have known*** that the undisclosed AECDs installed in the 2013-2019 RAMs were parts of those vehicles that were being offered for sale or installed for such use or put to such use." (emphasis added).

2) <u>The CARB Complaint</u>

81.    The CARB Complaint alleged that Cummins sold or caused to be sold 6.7-liter diesel engines installed in model year 2013 through 2023 RAM 2500 and RAM 3500 vehicles in California that failed to comply with California and federal laws and regulations covering vehicle emissions and certifications. According to CARB, "[a]pproximately 97,806 Subject Vehicles were sold in California."

82.    The CARB Complaint alleges that "[Cummins'] certification applications for the Subject Vehicles failed to disclose [AECDs] that significantly affect the emissions control systems, making them undisclosed and unapproved" and, therefore, do not match the certification applications submitted to CARB by Cummins.

83.    Like the DOJ Complaint, the CARB Complaint also alleges that the Subject Vehicles contained undisclosed AECDs that were Defeat Devices and found that they violated California law. The CARB Complaint further found that "[t]hese undisclosed AECDs and defeat devices in Subject Vehicles, alone or in combination, ***cause the vehicles to emit NOx at dramatically elevated levels during certain real world driving conditions in comparison to their***

*performance during regulated emissions tests*." (emphasis added). Accordingly, "[Cummins']

actions violated various California laws concerning vehicle certification and emissions."

84.    The CARB Complaint alleges that "the application materials submitted by

Cummins identified certain AECDs and provide some information on those AECDs, but

[a]dditional AECDs were either not disclosed to CARB, or, if the AECDs or parts of the AECDs

were disclosed, they were not disclosed fully and accurately." It alleged further that "[o]ne or

more of the AECDs in the Subject Vehicles qualify as 'defeat devices' in violation of California

law" because "they reduce the effectiveness of the Subject Vehicles' emission control systems

and cause the vehicles to emit increased NOx under certain real world driving conditions. . ."

85.    CARB found that Cummins "*knew, or should have known*, that its statements of

compliance in each of their applications for certification were inadequate regarding their

compliance with California and federal emissions laws and regulations, because, among other

reasons, each statement of compliance related to a certification application that failed to disclose

AECDs and defeat devices . . . and emissions standard failures." (emphasis added). The CARB

Complaint further alleges that Cummins' "*actions constitute multiple willful violations of

California Vehicle Code § 27156*," which prohibits the sale of a "system that alters or modifies

the original design or performance of the motor vehicle pollution control device or system."

(emphasis added) "'Willfully' 'implies simply a purpose or willingness to commit the act, or

make the omission referred to.'" (quoting Cal. Veh. Code § 27156). CARB also alleged that

Cummins' "knowingly, intentionally, and/or recklessly created or assisted in the creation of a

substantial and unreasonable nuisance as a result of [its] actions emission harmful excess

emissions in California."

86.     The CARB Complaint further alleges that "Subject Vehicles, as manufactured, do not conform in all material respects to the design specifications described in the applications for certification that purportedly cover them, in that they (a) contain AECDs that were not disclosed or inadequately disclosed in the applications; (b) contain defeat devices; and/or (c) as a result of the AECDs that were not disclosed or inadequately disclosed in the applications, and or defeat devices, the Subject Vehicles contain undisclosed or unapproved on-board diagnostic non-compliances . . . ."

**I.   When it was Revealed that the DOJ and EPA Found that Cummins Intentionally Violated Emissions Rules and Cummins Had Agreed to Pay a $1.675 Billion Penalty, the Company's Stock Dropped, Harming Investors.**

87.     On December 22, 2023, before the market opened, the Company filed with the SEC a current report on Form 8-K in which it announced that it reached an agreement in principle with the U.S. EPA, the California Air Resources Board ("CARB"), the Environmental and Natural Resources Division of the U.S. Department of Justice, and the California Attorney General's Office "to resolve civil claims regarding the Company's emissions certification and compliance process for certain engines primarily used in pick-up truck applications in the United States." The December 22, 2023 8-K further stated that "The Company expects to record a charge of approximately ***$2.04 billion*** in the fourth quarter of 2023 to resolve these claims and related matters."  That charge included a ***$1.675 billion dollar fine DOJ required Cummins to pay.***

88.     On the same day, the United States Department of Justice released a press release entitled "Attorney General Merrick Garland Statement on the Agreement in Principle with Cummins to Settle Alleged Installation of Illegal Defeat Devices in Engines" (the "DOJ Press Release").

89.     The DOJ Press Release stated that Cummins "allegedly installed defeat devices on 630,000 model year 2013 to 2019 RAM 2500 and 3500 pickup truck engines" and "also allegedly

installed undisclosed auxiliary emission control devices on 330,000 model year 2019 to 2023 RAM 2500 and 3500 pickup truck engines," indicating that the Company engaged in malfeasance for years after it disclosed the review of its compliance with emissions standards.

90.    The DOJ Press Release defined "defeat devices" as "parts or software that bypass, defeat, or render inoperative emissions controls such as emission sensors and onboard computers."

91.    The DOJ Press Release quoted Attorney General Merrick Garland as saying:

> *Today, the Justice Department reached an initial agreement with Cummins Inc. to settle claims that, over the past decade, the company unlawfully altered hundreds of thousands of engines to bypass emissions tests in violation of the Clean Air Act*. As part of the agreement, *the Justice Department will require Cummins to pay $1.675 billion*, *the largest civil penalty we have ever secured under the Clean Air Act, and the second largest environmental penalty ever secured*.
>
> *The types of devices we allege that Cummins installed in its engines to cheat federal environmental laws have a significant and harmful impact on people's health and safety. For example, in this case, our preliminary estimates suggest that defeat devices on some Cummins engines have caused them to produce thousands of tons of excess emissions of nitrogen oxides*. The cascading effect of those pollutants can, over long-term exposure, lead to breathing issues like asthma and respiratory infections.

(Emphasis added)

92.    On the same day the settlement was announced, JP Morgan analysts Tami Zakaria, Chaya Levkowitz, Eshan Desai, and Alec R McGuire, issued a report on December 22, 2023 concerning Cummins that was entitled: "Thoughts on the Agreement to Settle Regulatory Proceedings." In the report, those analysts stated that Cummins' management told them that the settlement was within their "***range of expectations***":

> *The settlement amount was within management's range of expectations*, although CMI negotiated earnestly to reduce it. Management added that the per vehicle settlement amount (>1MM engines) is below prior settlements by a few other competitors in recent years in (unrelated) settlement charges.

(emphasis added).

93.    Evercore ISI analysts David Raso, Jeff Morrison, and Oliver Liao also issued an analyst report concerning Cummins on the day the settlement was announced. It echoed the JP Morgan report, stating: "I spoke with [Cummins] this morning" and that Cummins' management told that analyst that the "*size [of the settlement] didn't necessarily surprise them*." (emphasis added).

94.    The Evercore ISI analyst report further stated that the size of the settlement was *twice what investors expected*: "based on my conversations with investors over time and my own rough calculations, the just announced $2.04b was roughly 2x what most investors would have guesstimated."

95.    The Evercore ISI analyst report also explained that the size of the penalty showed a lack of cooperation by Cummins with the EPA and DOJ:

> Note today's penalty, interestingly, covers a relative inexpensive software fix (with that cost having already been accrued for at only $59m) *with the ~$2b in penalty generally a EPA/DoJ view of less than satisfactory disclosure by Cummins in their emissions process.*

(emphasis added).

96.    On this news, the price of Cummins stock fell by $7.01 per share, or 2.87%, to close at $236.99 on December 22, 2023.

97.    On January 10, 2024, as discussed above, the DOJ and EPA filed the DOJ Complaint and California Attorney General filed the CARB Complaint.  At the same time, DOJ and CARB filed a joint Consent Decree and CARB filed another partial consent decree, under which, in addition to paying a combined $1.675 billion in civil penalties, Cummins had to issue a mandatory recall of all 2013 to 2018 Model Year 2500 and 3500 RAM trucks to replace the software calibration installed in those vehicles with an upgraded calibration that Cummins

certified as being free of defeat devices.[5] The consent decree further required Cummins to implement extended warranty program covering certain components of the Subject Vehicles' emissions systems, engage in enhanced vehicle testing, alter its corporate compliance policies and practices to guard against future violations, and mitigate the excess NOx emissions caused by the defeat devices.

98.     On January 11, 2024, thedrive.com published an article by Caleb Jacobs, entitled "The EPA Isn't Playing Around With Its $2 Billion Cummins Diesel Emissions Penalty." David M. Uhlmann, Assistant Administrator of EPA's Office of Enforcement and Compliance Assurance, told Uhlmann that "Cummins deserves to pay every dollar" because Cummins actions were a "brazen scheme."

**J.    Accounting Principles Imposed a Duty to Disclose the Potential Financial Impact of the Government Investigations into the Engines Cummins Manufactured for Model 2500 and 3500 RAM trucks.**

99.     Generally Accepted Accounting Principles ("GAAP") are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements. SEC and NYSE rules and regulations require that publicly traded companies such as Cummins include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation SX. Cummins represented that it prepared its consolidated financial statements in accordance with GAAP during the Class Period.

100.    GAAP dictates that Cummins was required to disclose a loss contingency associated with the DOJ/EPA and CARB's Investigations. Pending or threatened litigation and

---

[5] *See U.S. v. Cummins Inc.*, 24-cv-00088 (D.D.C.), ECF No. 2-1 (Joint EPA / CARB Consent Decree); *State of California v. Cummins, Inc*., 24-cv-00090 (D.D.C.), ECF No. 3-1 (CARB Partial Consent Decree).

actual or possible claims and assessments, including those by the government, are examples of loss contingencies. ASC 450-20-05-10. Under certain circumstances, GAAP requires that a company disclose a loss contingency in the financial statements; and under certain circumstances, GAAP requires that a company also accrue a loss contingency in its financial statements by a charge to income.

101.    The Company's financial statements throughout the Class Period violated U.S. GAAP because they failed to either recognize a probable loss from a loss contingency and provide appropriate disclosures about the nature of the loss accrual, or, alternatively, to at least disclose that such loss was reasonably possible, its nature, and the amount or range of such loss.

102.    SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

103.    Accounting Standard Codification ("ASC") 450-20 codifies GAAP regarding "loss contingencies." A loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss that will ultimately be resolved when one or more future events occurs or fails to occur. *See* ASC 450-20-20. Loss contingencies include (i) actual or possible claims and (ii) pending or threatened litigation. *See* ASC 450-20-05-10.

104.    With respect to accounting for loss contingencies, GAAP uses the terms *probable*, *reasonably possible*, and *remote* to identify the range of possibilities of whether a loss has been incurred:

a. *Probable*. The future event or events are likely to occur.

b. *Reasonably possible*. The chance of the future event or events occurring is more than remote but less than likely.

23

c. *Remote*. The chance of the future event or events occurring is slight. ASC 450-20-20.

105.    An accounting industry rule of thumb holds that: (i) an event that has a less than 10% chance of occurring is considered "remote;" (ii) an event that has between a 10% and 50% chance of occurring is considered "reasonably possible;" and (iii) an event that has a greater than 50% chance of occurring is considered "probable."

106.    Under GAAP, an issuer must disclose a loss contingency—such as the liability resulting from Cummins' Clean Air Act violations—if it is at least reasonably possible that a loss has been incurred. Additionally, an issuer must also record an accrual for a loss contingency, as a charge against income in its financial statements, if (i) it is probable that an asset has been impaired or a liability has been incurred as of the date of the financial statements and (ii) the amount of the loss can be reasonably estimated. ASC 450-20-25-2.

107.    The requirement that an accrual be "reasonably estimated" shall not delay accrual of a loss until only a single amount can be reasonably estimated. To the contrary, when it is probable that an asset has been impaired or a liability has been incurred, and information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated. Thus, when a reasonable estimate of a loss contingency is a range, the loss can be reasonably estimated and an amount shall be accrued for the loss. ACS 450-20-25-5. If some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued. Even though the minimum amount in the range is not necessarily the amount of loss that will be ultimately determined, it is not likely that the ultimate loss will be less than the minimum amount. ASC 450-20-30-1. If a loss cannot be

accrued in the period when it is probable that an asset had been impaired or a liability had been incurred because the amount of loss cannot be reasonably estimated, the loss shall be charged to the income of the period in which the loss can be reasonably estimated. ASC 450-20-25-7.

108.    Disclosure of an additional amount of exposure to loss is required if there is a reasonable possibility that the additional loss will be incurred. ASC 450-20-30-1; ASC 450-20-50-3b. Moreover, a company is required to disclose if it is at least reasonably possible that the loss estimate will materially change in the near future and provide an estimate of the possible loss or range of loss, or state that such an estimate cannot be made. ASC 450-20-50-2 and ASC 275-10-50-8 – 9.

109.    With respect to unasserted claims and assessments, an entity must determine the degree of probability that a suit may be filed or a claim or assessment may be asserted and the possibility of an unfavorable outcome. If an unfavorable outcome is probable and the amount of loss can be reasonably estimated, accrual of a loss is required. ASC 450-20-55-14.

110.    If there is at least a reasonable possibility that a loss may have been incurred, GAAP requires the issuer to disclose "the nature of the contingency" and "an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." ASC 450-20-50-3 and ASC 450-20-50-4. If there has been no manifestation by a potential claimant of an awareness of a possible claim, disclosure is still required if (i) it is considered probable that a claim will be asserted, and (ii) there is a reasonable possibility that the outcome will be unfavorable. ASC 450-20-50-6. When an accrual for a loss contingency is made, a disclosure of the nature of the accrual, and in some circumstances the amount accrued, may be necessary for the financial statements not to be misleading. ASC 450-20-50-1.

111.    In evaluating whether a loss contingency is probable, reasonably possible or

remote, a company has a duty to conduct a reasonable investigation of the facts within its possession, including interviewing personnel, clients and business associates and reviewing its records. A company must also review its records and obtain facts to reasonably estimate the amount of a contingent liability. Defendants' statutorily imposed obligation to keep accurate books and records concerning the violations implicated by the DOJ/EPA and CARB Investigations also required Defendants to evaluate the number of vehicles in which Cummins installed defeat devices. *See* 15 U.S.C. 7241; 17 CFR 240.13a-15(f).

112.    Because GAAP requires a company to account for contingent liabilities, it imposes an obligation on a company's management to make assessments in connection with the company's financial reporting as to whether contingent liabilities exist and whether they require accrual, disclosure or both. This, in turn, requires management to evaluate evidence that is reasonably available to them to assess the probabilities associated with the contingent liability accounting and disclosure requirements.

113.    To comply with the aforementioned GAAP requirements, each reporting period the company was required to make a reasonable investigation, including evaluating any new relevant facts, to determine (i) whether the government has manifested an awareness of a possible claim, or (ii) whether the likelihood of a future claim is probable, and (iii) the likely outcome of such a claim. Cummins was required to perform that analysis each quarterly and annual reporting period, and consider each new fact in its possession in evaluating accounting and disclosure of loss contingencies resulting from its Clean Air Act violations.

114.    Had Defendants performed the required evaluation of all information available to them, as discussed below, Defendants would have undoubtedly arrived at a conclusion that, at the very least, the Company was required to fully disclose the nature of its loss contingency related

to its Clean Air Act violations and to record, or at the very least disclose, an estimate of related loss.

115.    Cummins had the benefit of being able to evaluate the January 2017 resolution of the Clean Air Act investigation into Volkswagen. As with Cummin in this case, (1) Volkswagen violated the Clean Air Act by installing defeat devices in its diesel engines in the form of computer software designed to cheat on federal emission tests and (2) Volkswagen's vehicles exceeded NOx emissions standards under real world driving conditions. To resolve Clean Air Claims for 590,000 vehicles (from model years 2009 to 2016) equipped with defeat devices, Volkswagen had to pay a civil penalty of $1.45 billion to DOJ.

116.    Cummins was also able to evaluate the $305 civil penalty paid by Fiat Chrysler for installing defeat devices in 100,000 diesel vehicles, which DOJ announced on January 10, 2019, also before the Class Period.

117.    Finally, Cummins was able to evaluate $875 million penalty that Daimler agreed too for installing defeat devices in 250,000 diesel vehicles for a significant portion of the Class Period. The DOJ announced that settlement on September 14, 2020, more than three years before its announcement of Cummins' $1.675 billion civil penalty for 630,000 defeat device equipped vehicles.

118.    Throughout the Class Period, Cummins and the Individual Defendants were aware of Cummins' liability related to its Clean Air Act violations. Before the Class Period, the 2016 Consumer Class Action plaintiffs showed that Cummins's 2012 Model RAM 2500 and 3500 trucks did not meet NOx emission standards.

119.    After Cummins announced that it was undertaking a formal review of its emissions certification process and compliance following questions from the EPA and CARB about the

certification process of its 2019 RAM 2500 and 3500 trucks on April 29, 2019, Defendant Linebarger promised during Cummins' April 30, 2019 earnings call that "we will work with urgency to get to the bottom of the questions that we got and to examine our certification and compliance processes. So we will be working with urgency to complete that review." Furthermore, Linebarger admitted that all the emissions testing data was in Cummins' possession, stating "we do, do our own test and evaluations and we submit that data to the EPA and to CARB, who then do their own independent valuation, sometimes they do independent testing."

120.    According to Cummins' Second Quarter 2019 10-Q, by July 30, 2019, the EPA and CARB had raised concerns that Cummins emissions systems for its 2019 Model Year RAM 2500 and 3500 trucks may reduce the effectiveness of their emissions control systems and do not fully comply with certification requirements.

121.    According to Cummins' Third Quarter 2019 10-Q, by October 29, 2019, EPA and CARB had raised concerns with Cummins that their RAM 2500 and 3500 trucks were equipped with defeat devices. Additionally, Cummins had developed a new calibration of the emissions system for the 2019 RAM 2500 and 3500 trucks that was included in all engines shipped since September 2019. The regulators also asked Cummins to look at other engines and model years and Cummins was responding to requests from the DOJ and SEC.

122.    According to Cummins' Third Quarter 2021 10-Q, by November 2, 2021, the EPA and CARB had informed Cummins that they had turned their attention to RAM 2500 and 3500 trucks for model years 2013 through 2018.

123.    According to Cummins' First Quarter 2022 10-Q, by May 3, 2022, Cummins was developing a new software calibration for and intending to recall RAM 2500 and 3500 trucks for model years 2013 through 2018. This was the first time Cummins accrued a loss for the EPA/DOJ

and CARB investigations, but it was only $30 million for the recall.

124.    Cummins stated in its First Quarter 2023 10-Q (May 2, 2023), Second Quarter 2023 10-Q, (August 3, 2023), and Third Quarter (September 30, 2023) that "resolutions" with regulators may "involve [Cummins] agreeing to one or more consent decrees and paying civil penalties." They further stated that regulators had raised concerns regarding the completeness of Cummins' disclosures regarding its certification applications for RAM 2500 and 3500 for model years 2013 through 2023.  Despite this, Cummins continued to only accrue $30 million for RAM 2500 and 3500 trucks up until it announced a $2.04 billion dollar charge, including the $1.675 billion penalty, on December 22, 2023.

125.    Further, the DOJ and CARB Complaints were based on internal Cummins documents that Cummins produced to the EPA/DOJ and CARB that the Company carefully reviewed prior to belatedly providing them to the EPA/DOJ and CARB. The Company knew that these documents proved the Company's violations of the Clean Air Act and that they were now in the EPA/DOJ and CARB's possession.

126.    Additionally, the Company had an obligation to re-evaluate its liability as soon as the EPA and CARB notified the Company of their investigation.

127.    For each quarterly and annual reporting period from the beginning with the Second Quarter 2019 10-Q, if the loss wasn't probable, it was certainly reasonably possible, and thus Defendants violated GAAP by failing to at a minimum (i) fully disclose in its financial statements the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss.

128.    The Company's refusal to provide an estimate of its liability—or to take a provision reflecting that estimate is contrary to established law and the applicable accounting

principles.

## **MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD[6]**

129.    On February 11, 2019, the Company filed with the SEC its Annual Report on 10-K for the year ended December 31, 2018 ("2018 10-K") signed by Defendant Linebarger. Attached to the 2018 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Linebarger attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

130.    The 2018 10-K stated that Cummins "adher[ed] to all emissions regulations worldwide, including prohibiting the use of defeat devices in all of our products":

**ENVIRONMENTAL COMPLIANCE**

**Product Certification and Compliance**

We strive to have robust certification and compliance processes, ***adhering to all emissions regulations worldwide, including prohibiting the use of defeat devices in all of our products. We are transparent with all governing bodies in these processes, from disclosure of the design and operation of the emission control system***, to test processes and results, and later to any necessary reporting and corrective action processes if required.

We work collaboratively and proactively with emission regulators globally to ensure emission standards are clear, appropriately stringent and enforceable, in an effort to ensure our products deliver on our commitments to our customers and the environment in real world use every day.

Our engines are subject to extensive statutory and regulatory requirements that directly or indirectly impose standards governing emission and noise. ***Over the past several years we have substantially increased our global environmental compliance presence and expertise to understand and meet emerging product environmental regulations around the world.*** Our ability to comply with these and future emission standards is an essential element in maintaining our leadership position in regulated markets. We have made, and will continue to make, significant capital and research expenditures to comply with these standards. Our failure to

_____

[6] In this section, in Defendants' statements, all the emphasis in the titles is in the original and the rest of the emphasis is added.

comply with these standards could result in adverse effects on our future financial results.

131.    The foregoing statement that Cummins "prohibit[ed] the use of defeat devices in all of [its] products" was false and when made because Cummins illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks. The statement that "[w]e are transparent with all governing bodies in these processes," was also misleading because Cummins had deceived regulators concerning the AECDs for its Model Year 2013-2019 RAM 2500 and RAM 3500 trucks.

132.    The 2018 10-K further stated that Cummins met the EPA and CARB's NOx standards:

**EU and EPA Engine Certifications**

The current on-highway NOx and PM emission standards came into effect in the European Union (EU) on January 1, 2013, (Euro VI) and on January 1, 2010, for the EPA. ***To meet the more stringent heavy-duty on-highway emission standards, we used an evolution of our proven selective catalytic reduction (SCR) and exhaust gas recirculation (EGR) technology solutions*** and refined them for the EU and EPA certified engines to maintain power and torque with substantial fuel economy improvement and maintenance intervals comparable with our previous compliant engines. We offer a complete lineup of on-highway engines to meet the near-zero emission standards. Mid-range and heavy-duty engines for EU and EPA require NOx aftertreatment. ***NOx reduction is achieved by an integrated technology solution comprised of the XPI High Pressure Common Rail fuel system, SCR technology, next-generation cooled EGR, advanced electronic controls, proven air handling and the Cummins Diesel Particulate Filter (DPF). The EU, EPA and California Air Resources Board (CARB) have certified that our engines meet the current emission requirement***s. Emission standards in international markets, including Japan, Mexico, Australia, Brazil, Russia, India and China are becoming more stringent. We believe that our experience in meeting the EU and EPA emission standards leaves us well positioned to take advantage of opportunities in these markets as the need for emission control capability grows.

133.    The foregoing statement was materially false and misleading when made because Cummins' engines did not meet the EPA's emissions standard because Cummins illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks.

134.    The 2018 10-K also contained the following risk disclosure:

***Our products are subject to extensive statutory and regulatory requirements that can significantly increase our costs and, along with increased scrutiny from regulatory agencies and unpredictability in the adoption, implementation and enforcement of increasingly stringent emission standards by multiple jurisdictions around the world, could have a materially adverse impact on our results of operations, financial condition and cash flows.\***

Our engines are subject to extensive statutory and regulatory requirements governing emissions and noise, including standards imposed by the EPA, the EU, state regulatory agencies (such as the CARB) and other regulatory agencies around the world. Regulatory agencies are making certification and compliance with emissions and noise standards more stringent and subjecting diesel engine products to an increasing level of scrutiny. ***The discovery of noncompliance issues could have a materially adverse impact on our results of operations, financial condition and cash flows.***

Developing engines and components to meet more stringent and changing regulatory requirements, with different implementation timelines and emission requirements, makes developing engines efficiently for multiple markets complicated and could result in substantial additional costs that may be difficult to recover in certain markets. While we have met previous deadlines, our ability to comply with existing and future regulatory standards will be essential for us to maintain our competitive advantage in the engine markets we serve. The successful development and introduction of new and enhanced products in order to comply with new regulatory requirements are subject to other risks, such as delays in product development, cost over-runs and unanticipated technical and manufacturing difficulties.

In addition to these risks, the nature and timing of government implementation and enforcement of increasingly stringent emission standards in our worldwide markets are unpredictable and subject to change. Any delays in implementation or enforcement could result in a loss of our competitive advantage and could have a materially adverse impact on our results of operations, financial condition and cash flows.

135.    The foregoing statement was materially false and misleading when made because "noncompliance issues" were already occurring since Cummins had illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks.

136.    On July 30, 2019, Cummins filed with the SEC its quarterly reports on Form 10-Q for the periods ending June 30, 2019 (the "2Q19 Report") signed by Defendant Smith. Attached

to the 2Q19 Report were certifications pursuant to SOX signed by Defendants Linebarger and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

137.    The 2Q19 Report contained the following risk disclosure:

*We are conducting a formal internal review of our emissions certification process and compliance with emissions standards with respect to our pick-up truck applications and working with the EPA and CARB to address their questions about these applications. The results of this formal review and agency process, or the discovery of any noncompliance issues, could have a materially adverse impact on our results of operations and cash flows.* We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emissions standards with respect to all of our pick-up truck applications, *following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the agencies raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and did not fully comply with their requirements for certification.* As a result, our internal review focuses, in part, on the agencies' concerns. *We are working closely with the agencies to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the agencies' requirements.* We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance.

Due to the preliminary nature of the formal review, our collaboration with our regulators to address their questions and concerns and the presence of many unknown facts and circumstances, *we are not yet able to estimate the financial impact of these matters*. It is possible that the consequences of any remediation plans resulting from our formal review and this regulatory process could have a materially adverse impact on our results of operations and cash flows in the periods in which these emissions certification issues are addressed.

138.    The 2Q19 Report contained the following statement under both the heading

"**Legal Proceedings**" and in Cummins' consolidated financial statements:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emissions standards for our pick-up truck applications, *following conversations with the U.S. Environmental Protection Agency (EPA) and California Air Resources Board (CARB) regarding certification of our engines in model year 2019 RAM*

***2500 and 3500 trucks***. This review is being conducted with external advisors to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. In addition, we announced that we voluntarily disclosed our formal internal review to our regulators and other agencies and were working cooperatively to ensure a complete and thorough review. ***During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the agencies raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and did not fully comply with their requirements for certification.*** As a result, our internal review focuses, in part, on the agencies' concerns. ***We are working closely with the agencies to enhance our emission systems to improve the effectiveness of all of our pick-up truck applications and to fully address the agencies' requirements***. ***Due to the preliminary nature of our formal review, our collaboration with our regulators to address their questions and concerns and the presence of many unknown facts and circumstances, we cannot predict the outcome of this review and proce****s, and we cannot provide assurance that the matter will not have a materially adverse impact on our results of operations and cash flows.

139.    The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019 and (2) EPA and CARB had informed Cummins that they were concerned about the effectiveness of emissions control systems for the Cummins diesel engines in RAM 2500 and 3500 trucks, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen and Fiat Chrysler. Additionally, the statements portray Cummins cooperating with regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

140.    On October 29, 2019, Cummins filed with the SEC its quarterly reports on Form 10-Q for the period ending September 29, 2019 (the "3Q19 Report") signed by Defendant Smith.

Attached to the 3Q19 Report were certifications pursuant to SOX signed by Defendants Linebarger and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

141.    The 3Q19 Report contained the following risk disclosure:

***We are conducting a formal internal review of our emissions certification process and compliance with emissions standards with respect to our pick-up truck applications and working with the EPA and CARB, as well as the DOJ and SEC, to address their questions about these applications. The results of this formal review and regulatory and government agency processes, or the discovery of any noncompliance issues, could have a materially adverse impact on our results of operations and cash flows.***

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emissions standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. ***During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.*** As a result, our internal review focuses, in part, on the regulators' concerns. ***We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address our regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our discussions, the regulators have asked us to look at other model years and other engines, though the primary focus of our review has been the model year 2019 RAM.*** We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance. ***We are also fully cooperating with the DOJ's and the SEC's information requests and inquiries.***

Due to the continuing nature of the formal review, our ongoing cooperation with our regulators and other government agencies, and the presence of many unknown facts and circumstances, ***we are not yet able to estimate the financial impact of these matters***. It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory and agency processes could have a materially adverse impact on our results of operations and cash flows in the periods in which these emissions certification issues are addressed.

142.    The 3Q19 Report contained the following statement under both the heading

"**Legal Proceedings**" and in Cummins' consolidated financial statements:

> On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emissions standards for our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. In addition, we voluntarily disclosed our formal internal review to our regulators and to other government agencies, the Department of Justice (DOJ) and the SEC, and have been working cooperatively with them to ensure a complete and thorough review. ***During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices***. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emission systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our discussions, the regulators have asked us to look at other model years and other engines, though the primary focus of our review has been the model year 2019 RAM. We are also fully cooperating with the DOJ's and the SEC's information requests and inquiries***. ***Due to the continuing nature of our formal review, our ongoing cooperation with our regulators and other government agencies, and the presence of many unknown facts and circumstances, we cannot predict the final outcome of this review and these regulatory and agency processes***, and we cannot provide assurance that the matter will not have a materially adverse impact on our results of operations and cash flows.

143.    The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their

investigations concerned defeat devices installed in diesel engines, (3) Cummins had already developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks, indicating EPA told Cummins it believed the old AECDs were a defeat device, (4) regulators had asked Cummins to look at other model years and other engines, (5) and Cummins was also responding to information requests from the DOJ and SEC, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen and Fiat Chrysler. Additionally, the statements portray Cummins cooperating with regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

144.    On February 11, 2020, Cummins filed with the SEC its Annual Report on 10-K for the year ended December 31, 2019 (the "2019 10-K") signed by Defendants Linebarger and Smith. Attached to the 2019 10-K were certifications pursuant to SOX signed by Defendants Linebarger and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

145.    The 2019 10-K contained the following risk disclosure:

> ***We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pick-up truck applications and working with the EPA and CARB, as well as the Department of Justice (DOJ) and SEC, to address their questions about these applications. The results of this formal review and regulatory and government agency processes, or the discovery of any noncompliance issues, could have a material adverse impact on our results of operations and cash flows.***

> We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, ***following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns***

*that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.* As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. *Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our discussions, the regulators have asked us to look at other model years and other engines, though the primary focus of our review has been the model year 2019 RAM. We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance. We are also fully cooperating with the DOJ's and the SEC's information requests and inquiries*.

*Due to the continuing nature of the formal review, our ongoing cooperation with the regulators and other government agencies, and the presence of many unknown facts and circumstances, we are not yet able to estimate the financial impact of these matters*. It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory and agency processes could have a material adverse impact on our results of operations and cash flows in the periods in which these emissions certification issues are addressed.

146.    The 2019 10-K contained the following under both the heading "**Legal Proceedings**" and in Cummins' consolidated financial statements:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the EPA and the CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws*. In addition, we voluntarily disclosed our formal internal review to our regulators and to other government agencies, the DOJ and the SEC, and have been working cooperatively with them to ensure a complete and thorough review. During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.* As a result, our internal review focuses, in part, on the regulators' concerns. *We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that*

*has been included in all engines shipped since September 2019. During our discussions, the regulators have asked us to look at other model years and other engines, though the primary focus of our review has been the model year 2019 RAM. We are also fully cooperating with the DOJ's and the SEC's information requests and inquiries.* Due to the continuing nature of our formal review, our ongoing cooperation with our regulators and other government agencies, and the presence of many unknown facts and circumstances, *we cannot predict the final outcome of this review and these regulatory and agency processes, and we cannot provide assurance that the matter will not have a materially adverse impact on our results of operations and cash flows.*

147.    The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their investigations concerned defeat devices installed in diesel engines, (3) Cummins had already developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks, indicating EPA told Cummins it believed the old AECDs were a defeat device, (4) regulators had asked Cummins to look at other model years and other engines, and (5) Cummins was also responding to information requests from the DOJ and SEC, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen and Fiat Chrysler. Additionally, the statements portray Cummins cooperating with regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

148.    The 2019 10-K contained the following risk disclosure regarding the regulatory environment in which Cummins operates:

***Our products are subject to extensive statutory and regulatory requirements that can significantly increase our costs and, along with increased scrutiny from regulatory agencies and unpredictability in the adoption, implementation and enforcement of increasingly stringent emission standards by multiple jurisdictions around the world, could have a material adverse impact on our results of operations, financial condition and cash flows.***

Our engines are subject to extensive statutory and regulatory requirements governing emissions and noise, including standards imposed by the EPA, the EU, state regulatory agencies (such as the CARB) and other regulatory agencies around the world. Regulatory agencies are making certification and compliance with emissions and noise standards more stringent and subjecting diesel engine products to an increasing level of scrutiny. ***The discovery of noncompliance issues could have a material adverse impact on our results of operations, financial condition and cash flows***.

Developing engines and components to meet more stringent and changing regulatory requirements, with different implementation timelines and emission requirements, makes developing engines efficiently for multiple markets complicated and could result in substantial additional costs that may be difficult to recover in certain markets. ***While we have met previous deadlines, our ability to comply with existing and future regulatory standards will be essential for us to maintain our competitive advantage in the engine markets we serve***. The successful development and introduction of new and enhanced products in order to comply with new regulatory requirements are subject to other risks, such as delays in product development, cost over-runs and unanticipated technical and manufacturing difficulties.

In addition to these risks, the nature and timing of government implementation and enforcement of increasingly stringent emission standards in our worldwide markets are unpredictable and subject to change. Any delays in implementation or enforcement could result in a loss of our competitive advantage and could have a material adverse impact on our results of operations, financial condition and cash flows.

149.    This statement was materially false and misleading when made because (1) "noncompliance issues" were already occurring since Cummins had illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks and was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs and (2) Cummins had not "met previous deadlines" to comply with emission regulations.

150.    The 2019 10-K contained the following section on environmental sustainability:

We adopted our comprehensive environmental sustainability plan in 2014 after examining our entire environmental footprint, focusing on the key areas of water, waste, energy and greenhouse gases (GHG). As the concept and scope of environmental sustainability has matured and broadened, leaders have moved from initially working on environmental impacts within our direct control in our operations to an expanded view of fuel and raw materials that reaches across the entire product life-cycle from design to manufacture to end of life. ***Our environmental sustainability plan is the way we carry out our priorities, goals and initiatives in our action areas, including reducing our carbon footprint, using fewer natural resources and partnering to solve complex problems***.

The highest level of accountability for Cummins' climate-related risks and opportunities is with the Safety, Environment and Technology (SET) committee of the Board of Directors (the Board). The Action Committee for Environmental Sustainability meets monthly and reports to the Chairman and to the SET committee at least annually.

Our Sustainability Progress Report for 2018/2019 includes goal progress and other key environmental and climate metrics and targets. This and prior reports as well as a Data Book of more detailed environmental data in accordance with the Global Reporting Initiative's Standard core compliance designation are available on our website at www.cummins.com. Our annual submission to the Carbon Disclosure Project (CDP) for climate change and water are also available on the website. The climate submission provides information on our scenario planning exercise for climate and other risks as requested by CDP. These reports and data book are not incorporated into this Form 10-K by reference. We currently report on the following environmental sustainability goals and commitments from our 2014 plan:

- a product vision statement — "powering the future through product innovation that makes people's lives better and reduces our environmental footprint;"
- partnering with customers to improve the fuel efficiency of our products in use, ***targeting an annual run-rate reduction of 3.5 million metric tons of carbon dioxide***;
- achieving a 32 percent energy intensity reduction from company facilities by the end of 2020 (using a baseline year of 2010) and increasing the portion of electricity we use derived from renewable sources;
- reducing direct water use by 50 percent adjusted for hours worked and achieving water neutrality at 15 sites by the end of 2020;
- increasing our recycling rate from 88 percent to 95 percent and achieving zero disposal at 30 sites by the end of 2020; and
- utilizing the most efficient methods and modes to move goods across our network to reduce carbon dioxide per kilogram of goods moved by 10 percent by the end of 2020.

We continue to articulate our positions on key public policy issues and on a wide range of environmental issues. We are actively engaged with regulatory, industry and other stakeholder groups around the world as GHG and fuel efficiency standards become more prevalent globally. We were named number 17 in Newsweek's 2019 Green Ranking of U.S. companies, number 14 among Barron's Top 100 Most Sustainable Companies as well as named to the Dow Jones North American Sustainability Index for the fourteenth consecutive year in 2019.

*In late 2019, Cummins introduced PLANET 2050, a sustainability strategy focused on three priority areas: addressing climate change and air emissions, using natural resources in the most sustainable way and improving communities*. It includes eight specific goals to achieve by 2030, as well as aspirational targets for 2050. Cummins is currently evaluating how the new goals will be integrated into business planning and will report on progress beginning in 2022.

151.    This statement was materially false and misleading when made because Cummins

was not "addressing climate change and air emissions" given that illegally installed defeat devices

in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks.

152.    The 2019 10-K contained the following statement on EPA Engine Certifications:

**EU and EPA Engine Certifications**

The current on-highway NOx and PM emission standards came into effect in the EU on January 1, 2013, (Euro VI) and on January 1, 2010, for the EPA. *To meet these regulations we used an evolution of our proven selective catalytic reduction (SCR) and exhaust gas recirculation (EGR) technology solutions and refined them for the EU and EPA certified engines to maintain power and torque with substantial fuel economy improvement and maintenance intervals comparable with our previous compliant engines.* We offer a complete lineup of on-highway engines to meet the near-zero emission standards. Mid-range and heavy-duty engines for EU and EPA require NOx aftertreatment. NOx reduction is achieved by an integrated technology solution comprised of the XPI High Pressure Common Rail fuel system, SCR technology, next-generation cooled EGR, advanced electronic controls, proven air handling and the Cummins Diesel Particulate Filter (DPF). *The EU, EPA and CARB have certified that our engines meet the current emission requirements.* Emission standards in international markets, including Japan, Mexico, Australia, Brazil, Russia, India and China are becoming more stringent. We believe that our experience in meeting the EU and EPA emission standards leaves us well positioned to take advantage of opportunities in these markets as the need for emission control capability grows.

153.    The foregoing statement was materially false and misleading when made because Cummins' engines did not meet the EPA and CARB's certification standard since Cummins illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks and was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

154.    On April 28, 2020, July 28, 2020, and October 27, 2020, the Company filed with the SEC its quarterly reports on Form 10-Q for the periods ending March 29, 2020 (the "1Q20 Report"), June 28, 2020 (the "2Q20 Report"), and September 27, 2020 (the "3Q20 Report") signed by Defendant Smith. Attached to the 1Q20, 2Q20, and 3Q20 Reports were certifications pursuant to SOX signed by Defendants Linebarger and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

155.    The 1Q20, 2Q20, and 3Q20 Reports each contained the following risk disclosure:

*We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pick-up truck applications and working with the EPA and CARB, as well as the Department of Justice (DOJ) and SEC, to address their questions about these applications. The results of this formal review and regulatory and government agency processes, or the discovery of any noncompliance issues, could have a material adverse impact on our results of operations and cash flows.*

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. *During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.* As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. *Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our*

*discussions, the regulators have asked us to look at other model years and other engines, though the primary focus of our review has been the model year 2019 RAM. We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance. We are also fully cooperating with the DOJ's and the SEC's information requests and inquiries.[] Due to the continuing nature of the formal review, our ongoing cooperation with the regulators and other government agencies, and the presence of many unknown facts and circumstances, we are not yet able to estimate the financial impact of these matters.* It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory and agency processes could have a material adverse impact on our results of operations and cash flows in the periods in which these emissions certification issues are addressed.

156.    The 1Q20, 2Q20, and 3Q20 Reports each contained the following under both the

heading "**Legal Proceedings**" and in Cummins' consolidated financial statements:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. In addition, we voluntarily disclosed our formal internal review to the regulators and to other government agencies, the Department of Justice (DOJ) and the SEC, and have been working cooperatively with them to ensure a complete and thorough review. *During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our discussions, the regulators have asked us to look at other model years and other engines, though the primary focus of our review has been the model year 2019 RAM. We are also fully cooperating with the DOJ's and the SEC's information requests and inquiries.* Due to the continuing nature of our formal review, our ongoing cooperation with our regulators and other government agencies, and the presence of many unknown facts and circumstances, *we cannot predict the final outcome of this review and these regulatory and agency processes*, and we cannot

provide assurance that the matter will not have a materially adverse impact on our results of operations and cash flows.

157.    The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their investigations concerned defeat devices installed in diesel engines, (3) Cummins had already developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks, indicating EPA told Cummins it believed the old AECDs were a defeat device, (4) regulators had asked Cummins to look at other model years and other engines, and (5) Cummins was also responding to information requests from the DOJ and SEC, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen, Fiat Chrysler, and Daimler AG (for the 3Q20 Report). Additionally, the statements portray Cummins cooperating with regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

158.    On February 10, 2021, Cummins filed with the SEC its Annual Report on 10-K for the year ended December 31, 2020 (the "2020 10-K") signed by Defendants Linebarger and Smith. Attached to the 2020 10-K were certifications pursuant to SOX signed by Defendants Linebarger and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

159.    The 2020 10-K contained the following risk disclosure:

*We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pick-up truck applications and are working with the EPA and CARB to address their questions about these applications. The results of this formal review and regulatory processes, or the discovery of any noncompliance issues, could have a material adverse impact on our results of operations and cash flows.*

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, *following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks*. *During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices*. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. *Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our discussions, the regulators have asked us to look at other model years and other engines.* We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance.

*Due to the continuing nature of the formal review, our ongoing cooperation with the regulators and the presence of many unknown facts and circumstances, we are not yet able to estimate the financial impact of these matters*. It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows in the periods in which these emissions certification issues are addressed.

160.    The 2020 10-K contained the following under "**Legal Proceedings**" in Cummins

consolidated financial statements:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. In addition, we voluntarily disclosed our formal internal review to the regulators and

to other government agencies, the Department of Justice (DOJ) and the SEC, and worked cooperatively with them to ensure a complete and thorough review. We fully cooperated with the DOJ's and the SEC's information requests and inquiries and, based on recent communications with these agencies, we do not expect further inquiries. ***During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.*** As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our discussions, the regulators have asked us to look at other model years and other engines. Due to the continuing nature of our formal review, our ongoing cooperation with our regulators and the presence of many unknown facts and circumstances, we cannot predict the final outcome of this review and these regulatory processes***, and we cannot provide assurance that the matter will not have a materially adverse impact on our results of operations and cash flows.

161.    The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their investigations concerned defeat devices installed in diesel engines, (3) Cummins had already developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks, indicating EPA told Cummins it believed the old AECDs were a defeat device,  (4) regulators had asked Cummins to look at other model years and other engines, and (5) Cummins responded to information requests from the DOJ and SEC, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen, Fiat Chrysler, and Daimler AG. Additionally, the statements portray Cummins cooperating with

regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

162.    The 2020 10-K contained the following risk disclosure regarding the regulatory environment in which Cummins operates:

> ***Our products are subject to extensive statutory and regulatory requirements that can significantly increase our costs and, along with increased scrutiny from regulatory agencies and unpredictability in the adoption, implementation and enforcement of increasingly stringent and fragmented emission standards by multiple jurisdictions around the world, could have a material adverse impact on our results of operations, financial condition and cash flows.***

> Our engines are subject to extensive statutory and regulatory requirements governing emissions and noise, including standards imposed by the EPA, the EU, state regulatory agencies (such as the CARB) and other regulatory agencies around the world. ***Regulatory agencies are making certification and compliance with emissions and noise standards more stringent and subjecting diesel engine products to an increasing level of scrutiny. The discovery of noncompliance issues could have a material adverse impact on our results of operations, financial condition and cash flows***.

> Developing engines and components to meet more stringent and changing regulatory requirements, with different implementation timelines and emission requirements, makes developing engines efficiently for multiple markets complicated and could result in substantial additional costs that may be difficult to recover in certain markets. ***While we have met previous deadlines, our ability to comply with existing and future regulatory standards will be essential for us to maintain our competitive position in the engine applications and industries we serve.*** The successful development and introduction of new and enhanced products in order to comply with new regulatory requirements are subject to other risks, such as delays in product development, cost over-runs and unanticipated technical and manufacturing difficulties.

> In addition to these risks, the nature and timing of government implementation and enforcement of increasingly stringent emission standards in our worldwide markets are unpredictable and subject to change. Any delays in implementation or enforcement could result in a loss of our competitive advantage and could have a material adverse impact on our results of operations, financial condition and cash flows.

163.    This statement was materially false and misleading when made because (1) "noncompliance issues" were already occurring since Cummins had illegally installed defeat

devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks and was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs and (2) Cummins had not "met previous deadlines" to comply with emission regulations.

164.    The 2020 10-K contained the following section on environmental sustainability:

We are committed to making people's lives better by powering a more prosperous world. That prosperity includes strong communities, robust business and environmental sustainability.

The highest level of accountability for our climate-related risks and opportunities is with the Safety, Environment and Technology (SET) Committee of the Board of Directors (the Board). The Action Committee for Environmental Sustainability meets monthly and reports to the Chairman and to the SET Committee at least annually.

***In late 2019, we introduced PLANET 2050, a sustainability strategy focused on three priority areas: addressing climate change and air emissions, using natural resources in the most sustainable way and improving communities***. The strategy includes eight specific goals to achieve by 2030, including science-based carbon dioxide reduction targets for newly sold products and facilities, as well as aspirational targets for 2050. We are currently evaluating how the new goals will be integrated into business planning and will report on progress beginning in 2022.

Our Sustainability Progress Report for 2019/2020 reports on environmental sustainability goals and commitments from our 2014 plan as well as other key environmental and climate metrics and targets. The 2014 plan goals were as follows:

- ***partnering with customers to improve the fuel efficiency of our products in use, targeting an annual run-rate reduction of 3.5 million metric tons of carbon dioxide***;
- achieving a 32 percent energy intensity reduction from company facilities by the end of 2020 (using a baseline year of 2010) and increasing the portion of electricity we use derived from renewable sources;
- reducing direct water use by 50 percent adjusted for hours worked and achieving water neutrality at 15 sites by the end of 2020;
- increasing our recycling rate from 88 percent to 95 percent and achieving zero disposal at 30 sites by the end of 2020 and
- utilizing the most efficient methods and modes to move goods across our network to reduce carbon dioxide per kilogram of goods moved by 10 percent by the end of 2020.

    *    *    *

***We continue to articulate our positions on key public policy issues and on a wide range of environmental issues. We are actively engaged with***

49

*regulatory, industry and other stakeholder groups around the world as greenhouse gases (GHG) and fuel efficiency standards become more prevalent globally*. We were named number 24 in Newsweek's Most Responsible Companies ranking, number 50 among Barron's Top 100 Most Sustainable Companies as well as named to the Dow Jones North American Sustainability Index for the fifteenth consecutive year in 2020.

165.    This statement was materially false and misleading when made because Cummins was not "addressing climate change and air emissions" given that illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks.

166.    The 2020 10-K made the following statements regarding engine certifications:

**Engine Certifications**

*Our engines are certified globally through various categories within on-highway and off-highway applications. Regulations in these categories typically control nitrous oxides (NOx)*, particulate matter (PM) and GHG. The current on-highway NOx and PM emission standards came into effect in India on April 1, 2020, (BS VI), China on July 1, 2019, (NS VI), the EU on January 1, 2013, (Euro VI) and on January 1, 2010, for the EPA. To meet these regulations, mid-range and heavy-duty engines for India, China, EU and EPA require NOx aftertreatment. NOx reduction is achieved by an integrated technology solution comprised of the XPI High Pressure Common Rail fuel system, SCR technology (in some cases), next-generation cooled EGR, advanced electronic controls, proven air handling and the Cummins Diesel Particulate Filter (DPF). *The Ministry of Road Transport and Highways, Ministry of Ecology and Environment, EU, EPA and CARB have certified that our engines meet the current emission requirements.* Emission standards in international markets, including Japan, Mexico, Australia, Brazil and Russia are becoming more stringent. *We believe that our experience in meeting the EU and EPA emission standards leaves us well positioned to take advantage of opportunities in these markets as the need for emission control capability grows.*

167.    The foregoing statement was materially false and misleading when made because Cummins' engines did not meet the EPA and CARB's certification standard because Cummins illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks and was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

168.    On May 4, 2021, Cummins held its earning call for the first quarter of 2021 in which Defendants Linebarger, Smith, Rumsey, *inter alia*, participated (the "Q1 2021 Earnings Call"). During the Q1 2021 Earning Call, Defendant Rumsey stated: "[W]e have a leading position today in North America with natural gas products and our engines in the US are already certified to meet that CARB's 24 ultra-low NOx regulation"

169.    The foregoing statement was materially false and misleading when made because Cummins' engines did not meet the EPA and CARB's certification standard since Cummins illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks and was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

170.    On May 4, 2021, August 3, 2021, and November 2, 2021, the Company filed with the SEC its quarterly reports on Form 10-Q for the periods ending April 4, 2021 (the "1Q21 Report"), July 4, 2021 (the "2Q21 Report"), and October 3, 2021 (the "3Q21 Report") signed by Defendant Smith. Attached to the 1Q21, 2Q21, and 3Q21 Reports were certifications pursuant to SOX signed by Defendants Linebarger and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

171.    The 1Q21 and 2Q21 Reports each incorporated by reference the risk disclosures in the 2020 10-K, as discussed in Paragraph 159.

172.    The 1Q21 and 2Q21 Reports contained the following under "**Legal Proceedings**" in Cummins consolidated financial statements:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors to ensure the certification and compliance processes for all of our pick-up truck applications are

51

consistent with our internal policies, engineering standards and applicable laws. In addition, we voluntarily disclosed our formal internal review to the regulators and to other government agencies, the Department of Justice (DOJ) and the SEC, and worked cooperatively with them to ensure a complete and thorough review. We fully cooperated with the DOJ's and the SEC's information requests and inquiries and, based on recent communications with these agencies, we do not expect further inquiries. ***During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.*** As a result, our internal review focuses, in part, on the regulators' concerns. ***We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our discussions, the regulators have asked us to look at other model years and other engines. Due to the continuing nature of our formal review, our ongoing cooperation with our regulators and the presence of many unknown facts and circumstances, we cannot predict the final outcome of this review*** and these regulatory processes, and we cannot provide assurance that the matter will not have a materially adverse impact on our results of operations and cash flows.

173.    The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their investigations concerned defeat devices installed in diesel engines, (3) Cummins had already developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks, indicating EPA told Cummins it believed the old AECDs were a defeat device, (4) regulators had asked Cummins to look at other model years and other engines, and (5) Cummins responded to information requests from the DOJ and SEC, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen,

Fiat Chrysler, and Daimler AG. Additionally, the statements portray Cummins cooperating with regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

174.    The 3Q21 Report contained the following risk disclosure:

*We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pick-up truck applications and are working with the U.S. Environmental Protection Agency (EPA) and California Air Resources Board (CARB) to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.*

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. *During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018.* We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance.

*Due to the continuing nature of the formal review, our ongoing cooperation with the regulators and the presence of many unknown facts and circumstances, we are not yet able to estimate the financial impact of these matters.* It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

175.    The 3Q21 Report contained the following under "**Legal Proceedings**" in Cummins consolidated financial statements:

> On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. In addition, we voluntarily disclosed our formal internal review to the regulators and to other government agencies, the Department of Justice (DOJ) and the SEC, and worked cooperatively with them to ensure a complete and thorough review. We fully cooperated with the DOJ's and the SEC's information requests and inquiries and, based on communications with these agencies, we do not expect further inquiries. *During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018. Due to the continuing nature of our formal review, our ongoing cooperation with our regulators and the presence of many unknown facts and circumstances, we cannot predict the final outcome of this review* and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.

176.    The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their

investigations concerned defeat devices installed in diesel engines, (3) Cummins had already developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks, indicating EPA told Cummins it believed the old AECDs were a defeat device, (4) regulators had turned their attention to other model years and other engines, including RAM 2500 and 3500 trucks for model years 2013 through 2018, and (5) Cummins responded to information requests from the DOJ and SEC, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen, Fiat Chrysler, and Daimler AG. Additionally, the statements portray Cummins cooperating with regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

177.    On February 8, 2022, Cummins filed with the SEC its Annual Report on 10-K for the year ended December 31, 2021 (the "2021 10-K") signed by Linebarger and Smith. Attached to the 2021 10-K were certifications pursuant to SOX signed by Defendants Linebarger and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

178.    The 2021 10-K contained the following risk disclosure:

***We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pick-up truck applications and are working with the EPA and CARB to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with the EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.***

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, ***following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. During conversations with the EPA and CARB about the***

***effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.*** As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018. We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement as part of our ongoing commitment to compliance.***

***Due to the continuing nature of the formal review, our ongoing cooperation with the regulators and the presence of many unknown facts and circumstances, we are not yet able to estimate the financial impact of these matters.*** It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

179.    The 2021 10-K contained the following under "**Legal Proceedings**" in Cummins

consolidated financial statements:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors as we strive to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. ***During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices.*** As a result, our internal review focuses, in part, on the regulators' concerns. ***We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018. Due to the continuing nature of our formal review, our***

> ***ongoing cooperation with our regulators and the presence of many unknown
> facts and circumstances, we cannot predict the final outcome of this review*** and
> these regulatory processes, nor whether, or the extent to which, they could have a
> material adverse impact on our results of operations and cash flows.

180.    The two previous statements were materially false and misleading when made
because it was reasonably possible Cummins would incur a loss as a result of the investigations
and they failed to (i) fully disclose the nature of the loss contingency arising from violations of
the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see*
Paragraphs 99-128).Given that (1) the Company had been conducting its own internal
investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their
investigations concerned defeat devices installed in diesel engines, (3) Cummins had already
developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and
3500 trucks, indicating EPA told Cummins it believed the old AECDs were a defeat device, (4)
regulators had turned their attention to other model years and other engines, including RAM 2500
and 3500 trucks for model years 2013 through 2018, and (5) Cummins responded to information
requests from the DOJ and SEC, it was at least reasonably possible that Cummins would be
subject to a large penalty, in light of the earlier penalties paid by Volkswagen, Fiat Chrysler, and
Daimler AG. Additionally, the statements portray Cummins cooperating with regulators even
though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful
AECDs.

181.    The 2021 10-K contained the following risk disclosure regarding the regulatory
environment in which Cummins operates:

> ***Our products are subject to extensive statutory and regulatory requirements that
> can significantly increase our costs and, along with increased scrutiny from
> regulatory agencies and unpredictability in the adoption, implementation and
> enforcement of increasingly stringent and fragmented emission standards by***

*multiple jurisdictions around the world, could have a material adverse impact on our results of operations, financial condition and cash flows.*

Our engines are subject to extensive statutory and regulatory requirements governing emissions and noise, including standards imposed by the EPA, the EU, state regulatory agencies (such as the CARB) and other regulatory agencies around the world. ***Regulatory agencies are making certification and compliance with emissions and noise standards more stringent and subjecting diesel engine products to an increasing level of scrutiny. The discovery of noncompliance issues could have a material adverse impact on our results of operations, financial condition and cash flows***.

Developing engines and components to meet more stringent and changing regulatory requirements, with different implementation timelines and emission requirements, makes developing engines efficiently for multiple markets complicated and could result in substantial additional costs that may be difficult to recover in certain markets. ***While we have met previous deadlines, our ability to comply with existing and future regulatory standards will be essential for us to maintain our competitive position in the engine applications and industries we serve.*** The successful development and introduction of new and enhanced products in order to comply with new regulatory requirements are subject to other risks, such as delays in product development, cost over-runs and unanticipated technical and manufacturing difficulties.

In addition to these risks, the nature and timing of government implementation and enforcement of increasingly stringent emission standards in our worldwide markets are unpredictable and subject to change. Any delays in implementation or enforcement could result in a loss of our competitive advantage and could have a material adverse impact on our results of operations, financial condition and cash flows.

182.    This statement was materially false and misleading when made because (1) "noncompliance issues" were already occurring since Cummins had illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks and was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs and (2) Cummins had not "met previous deadlines" to comply with emission regulations.

183.    The 2021 10-K contained the following section on environmental sustainability:

We are committed to making people's lives better by powering a more prosperous world. That prosperity includes strong communities, robust business and environmental sustainability.

The highest level of accountability for our climate-related risks and opportunities is with the Safety, Environment and Technology (SET) Committee of the Board of Directors (the Board). The internal Action Committee for Environmental Sustainability meets monthly and reports to the Chairman and to the SET Committee at least annually.

*In late 2019, we introduced PLANET 2050, a sustainability strategy focused on three priority areas: addressing climate change and air emissions*, using natural resources in the most sustainable way and improving communities. Additional commitments followed in 2021 with Cummins Water Works, which is our multi-million dollar program for strengthening communities through sustainable water and addressing the global water crisis. *The PLANET 2050 strategy includes nine specific goals to achieve by 2030, including science-based carbon dioxide reduction targets for newly sold products and facilities, as well as aspirational targets for 2050*. We are currently evaluating how the new goals will be integrated into business planning and will report on progress beginning in 2022. Key areas of focus in 2021 included product decarbonization pathways, customer sustainability collaboration and circular economy efforts such as incorporating expanded lifecycle analysis tools.

The nine PLANET 2050 goals for 2030 are as follows:

- Reduce absolute greenhouse gas (GHG) emissions from facilities and operations by 50 percent.
- Reduce scope three absolute lifetime GHG emissions from newly sold products by 25 percent.
- Partner with customers to reduce scope three GHG emissions from products in the field by 55 million metric tons.
- Reduce volatile organic compounds emissions from paint and coating operations by 50 percent.
- Create a circular lifecycle plan for every part to use less, use better, use again.
- Generate 25 percent less waste in facilities and operations as percent of revenue.
- Reuse or responsibly recycle 100 percent of packaging plastics and eliminate single-use plastics in dining facilities, employee amenities and events.
- Reduce absolute water consumption in facilities and operations by 30 percent.
- Produce net water benefits that exceed our annual water use in all our regions.

\*     \*     \*

We continue to articulate our positions on key public policy issues and on a wide range of environmental issues. We are actively engaged around the world to promote science-based climate policies by working with regulatory, industry and other stakeholders, including joining advocacy

groups and testifying before legislators and regulators. We will continue to work in partnership with others to advocate for tough, clear and enforceable regulations around the globe to address air and GHG emissions. In 2021, we were named to the S&P Dow Jones World and North American Sustainability Indices. It was the sixteenth consecutive time we were named to the North American index and the first time we were named to the world index since 2013. We were also named one of the inaugural recipients of the Prince Charles' Terra Carta Seal, recognizing companies for their leadership in climate action and sustainability.

We were named to Investor Business Daily's Best ESG Companies list for performance on environmental, social and governance matters, ranking number 37. We were also ranked number 84 among Barron's Top 100 Most Sustainable Companies.

184.    This statement was materially false and misleading when made because Cummins was not "addressing climate change and air emissions" given that illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks.

185.    The 2021 10-K contained the following statement concerning engine certification:

**Engine Certifications**

***Our engines are certified globally through various categories within on-highway and off-highway applications. Regulations in these categories typically control nitrogen oxides (NOx),*** particulate matter (PM) and GHG. The current on-highway NOx and PM emission standards came into effect in India on April 1, 2020, (Bharat Stage VI), China on July 1, 2019, (National Standard NS VI), the European Union (EU) on January 1, 2013, (Euro VI) and on January 1, 2010, for the EPA. To meet these regulations, mid-range and heavy-duty engines for India, China, EU and EPA require NOx aftertreatment. NOx reduction is achieved by an integrated technology solution comprised of the XPI High Pressure Common Rail fuel system, SCR technology (in some cases), next-generation cooled EGR, advanced electronic controls, proven air handling and the Cummins Diesel Particulate Filter (DPF). The Ministry of Road Transport and Highways, Ministry of Ecology and Environment, EU, EPA and CARB certified that our engines meet the current emission requirements. Emission standards in international markets, including Japan, Mexico, Australia, Brazil and Russia are becoming more stringent. ***We believe that our experience in meeting the EU and EPA emission standards leaves us well positioned to take advantage of opportunities in these markets as the need for emission control capability grows.***

186.    The foregoing statement was materially false and misleading when made because Cummins' engines did not meet the EPA and CARB's certification standard because Cummins illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks and was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

187.    On May 3, 2022 and August 3, 2022, the Company filed with the SEC its quarterly reports on Form 10-Q signed by Defendant Smith for the periods ending March 31, 2022 (the "1Q22 Report") and June 30, 2022 (the "2Q22 Report"), respectively. Attached to the 1Q22 and 2Q22 Reports were certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud signed by Defendant Smith (1Q22 and 2Q22 Reports), Defendant Linebarger (1Q22 Report), and Defendant Rumsey (2Q22 Report)

188.    The 1Q22 and 2Q22 Reports contained the following risk disclosure:

***We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pick-up truck applications and are working with the EPA and CARB to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with the EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.***

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, ***following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices***. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that***

*has been included in all engines shipped since September 2019. During our discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018. In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. We accrued $30 million for the recall during the first quarter of 2022, an amount that reflects our current estimate of the cost of the recall.*

*We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement and seek to reach further resolutions as part of our ongoing commitment to compliance. Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters.* It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

189. The 1Q22 and 2Q22 Reports contained the following under "**Legal Proceedings**"

in Cummins consolidated financial statements:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors as we strive to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. *During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018. In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. We accrued $30 million for the recall during the first quarter of 2022, an amount that reflects our current estimate of the cost of the recall.*

We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement and seek to reach further resolutions as part of our ongoing commitment to compliance. ***Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters.*** It is possible that the consequences of any remediation plans resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

190. The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their investigations concerned defeat devices installed in diesel engines, (3) Cummins had already developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks and was developing one for RAM 2500 and 3500 trucks for model years 2013 through 2018, indicating EPA told Cummins it believed the old AECDs were defeat devices, (4) regulators had turned their attention to other model years and other engines, including RAM 2500 and 3500 trucks for model years 2013 through 2018, and Cummins was planning to recall those trucks and had accrued $30 million for that purpose, (5) and Cummins responded to information requests from the DOJ and SEC, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen, Fiat Chrysler, and Daimler AG. Additionally, the statements portray Cummins cooperating with regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

191.    On November 4, 2022, the Company filed with the SEC its quarterly reports on Form 10-Q for the period ending September 30, 2022 (the "3Q22 Report") signed by Defendant Smith. Attached to the 3Q22 Report were SOX certifications signed by Rumsey and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

192.    The 3Q22 Report contained the following risk disclosure:

***We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pick-up truck applications and are working with the EPA and CARB to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with the EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.***

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. ***We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018 and Titan trucks for model years 2016 through 2019. In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. We accrued $30 million for the RAM recall during the first quarter of 2022, an amount that reflected our current estimate of the cost of that recall.*** We are also developing a new software calibration and hardware fix and will recall model years 2016 through 2019 Titan trucks. We accrued $29 million for the Titan recall during the third

quarter of 2022, an amount that reflected our current estimate of the cost of that recall.

***We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement and seek to reach further resolutions as part of our ongoing commitment to compliance. Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters.*** It is possible that the consequences resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

193.    The 3Q22 Report contained the following under "**Legal Proceedings**" in

Cummins consolidated financial statements:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors as we strive to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. ***During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018*** and Titan trucks for model years 2016 through 2019. ***In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. We accrued $30 million for the RAM recall during the first quarter of 2022, an amount that reflected our current estimate of the cost of that recall.*** We are also developing a new software calibration and hardware fix and will recall model years 2016 through 2019 Titan trucks. We accrued $29 million for the Titan recall during the third quarter of 2022, an amount that reflected our current estimate of the cost of that recall.

***We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement and seek to reach further***

*resolutions as part of our ongoing commitment to compliance. Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters.* It is possible that the consequences resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

194.    The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their investigations concerned defeat devices installed in diesel engines, (3) Cummins had already developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks and was developing one for RAM 2500 and 3500 trucks for model years 2013 through 2018, indicating EPA told Cummins it believed the old AECDs were defeat devices, (4) regulators had turned their attention to other model years and other engines, including RAM 2500 and 3500 trucks for model years 2013 through 2018, and Cummins was planning to recall those trucks and had accrued $30 million for that purpose (5) and Cummins had responded to information requests from the DOJ and SEC, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen, Fiat Chrysler, and Daimler AG. Additionally, the statements portray Cummins cooperating with regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

195.    On February 14, 2023, Cummins filed with the SEC its Annual Report on 10-K for the year ended December 31, 2022 (the "2022 10-K"). Attached to the 2022 10-K were certifications pursuant to SOX signed by Defendants Rumsey and Smith attesting to the accuracy

of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

196.    The 2022 10-K contained the following risk disclosure:

*We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pick-up truck applications and are working with the EPA and CARB to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with the EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor whether, or the extent to which, they could have a material adverse impact on our results of operations and cash flows.*

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. *During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019.* During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for *RAM 2500 and 3500 trucks for model years 2013 through 2018* and Titan trucks for model years 2016 through 2019. We have also been in communication with Environmental and Climate Change Canada regarding similar issues relating to some of these very same platforms. *In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. We accrued $30 million for the RAM recall during the first quarter of 2022, an amount that reflected our current estimate of the cost of that recall.* We are also developing a new software calibration and hardware fix and will recall model years 2016 through 2019 Titan trucks. We accrued $29 million for the Titan recall during the third quarter of 2022, an amount that reflected our current estimate of the cost of that recall.

We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement and seek to reach further

resolutions as part of our ongoing commitment to compliance. ***Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters.*** It is possible that the consequences resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

197.    The 2022 10-K contained the following statement under "**Legal Proceedings**" in

Cummins consolidated financial statements:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the Environmental Protection Agency (EPA) and California Air Resources Board (CARB) regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors as we strive to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018*** and Titan trucks for model years 2016 through 2019. We have also been in communication with Environmental and Climate Change Canada regarding similar issues relating to some of these very same platforms. In connection with these and other ongoing discussions with the EPA and CARB, ***we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. We accrued $30 million for the RAM recall during the first quarter of 2022, an amount that reflected our current estimate of the cost of that recall.*** We are also developing a new software calibration and hardware fix and will recall model years 2016 through 2019 Titan trucks. We accrued $29 million for the Titan recall during the third quarter of 2022, an amount that reflected our current estimate of the cost of that recall.

We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement and seek to reach further resolutions as part of our ongoing commitment to compliance. ***Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any***

*further financial impact of these matters.* It is possible that the consequences resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

198.    The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their investigations concerned defeat devices installed in diesel engines, (3) Cummins had already developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks and was developing one for RAM 2500 and 3500 trucks for model years 2013 through 2018, indicating EPA told Cummins it believed the old AECDs were defeat devices, (4) regulators had turned their attention to other model years and other engines, including RAM 2500 and 3500 trucks for model years 2013 through 2018, and Cummins was planning to recall those trucks and had accrued $30 million for that purpose (5) and Cummins responded to information requests from the DOJ and SEC, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen, Fiat Chrysler, and Daimler AG. Additionally, the statements portray Cummins cooperating with regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

199.    The 2022 10-K contained the following risk disclosure regarding the regulatory environment in which Cummins operates:

*Our products are subject to extensive statutory and regulatory requirements that can significantly increase our costs and, along with increased scrutiny from regulatory agencies and unpredictability in the adoption, implementation and enforcement of increasingly stringent and fragmented emission standards by*

*multiple jurisdictions around the world, could have a material adverse impact on our results of operations, financial condition and cash flows.*

Our engines are subject to extensive statutory and regulatory requirements governing emissions and noise, including standards imposed by the EPA, the EU, state regulatory agencies (such as the CARB) and other regulatory agencies around the world. Regulatory agencies are making certification and compliance with emissions and noise standards more stringent and subjecting diesel engine products to an increasing level of scrutiny. ***The discovery of noncompliance issues could have a material adverse impact on our results of operations, financial condition and cash flows***.

Developing engines and components to meet more stringent and changing regulatory requirements, with different implementation timelines and emission requirements, makes developing engines efficiently for multiple markets complicated and could result in substantial additional costs that may be difficult to recover in certain markets. ***While we have met previous deadlines, our ability to comply with existing and future regulatory standards will be essential for us to maintain our competitive position in the engine applications and industries we serve***. The successful development and introduction of new and enhanced products in order to comply with new regulatory requirements are subject to other risks, such as delays in product development, cost over-runs and unanticipated technical and manufacturing difficulties.

In addition to these risks, the nature and timing of government implementation and enforcement of increasingly stringent emission standards in our worldwide markets are unpredictable and subject to change. Any delays in implementation or enforcement could result in a loss of our competitive advantage and could have a material adverse impact on our results of operations, financial condition and cash flows.

200.    This statement was materially false and misleading when made because (1) "noncompliance issues" were already occurring since Cummins had illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks and was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs and (2) Cummins had not "met previous deadlines" to comply with emission regulations.

201.    The 2022 10-K contained the following statement on environmental sustainability:

*We are committed to making people's lives better by powering a more prosperous world. That prosperity includes strong communities, robust business and environmental sustainability.*

The highest level of accountability for our climate-related risks and opportunities is with the Safety, Environment and Technology (SET) Committee of the Board of Directors (the Board). The internal Action Committee for Environmental Sustainability meets monthly and reports to the Chief Executive Officer (CEO) and to the SET Committee at least annually.

*In 2019, we introduced PLANET 2050, a sustainability strategy focused on three priority areas: addressing climate change and air emissions, using natural resources in the most sustainable way and improving communities.* Additional commitments followed including Cummins Water Works, our program for strengthening communities through sustainable water and addressing the global water crisis, and Destination Zero, our long-term product decarbonization strategy. The PLANET 2050 strategy includes nine specific goals to achieve by 2030, including science-based carbon dioxide reduction targets for newly sold products and facilities, as well as aspirational targets for 2050. We started reporting progress in 2022. Key areas of focus in 2022 included product decarbonization pathways, customer sustainability collaboration and circular economy efforts such as incorporating expanded lifecycle analysis tools.

The nine PLANET 2050 goals for 2030 are as follows:
- Reduce absolute greenhouse gas (GHG) emissions from facilities and operations by 50 percent.
- Reduce scope three absolute lifetime GHG emissions from newly sold products by 25 percent.
- Partner with customers to reduce scope three GHG emissions from products in the field by 55 million metric tons.
- Reduce volatile organic compounds emissions from paint and coating operations by 50 percent.
- Create a circular lifecycle plan for every part to use less, use better, use again.
- Generate 25 percent less waste in facilities and operations as percent of revenue.
- Reuse or responsibly recycle 100 percent of packaging plastics and eliminate single-use plastics in dining facilities, employee amenities and events.
- Reduce absolute water consumption in facilities and operations by 30 percent.
- Produce net water benefits that exceed our annual water use in all our regions.

\*   \*   \*

*We continue to articulate our positions on key public policy issues and on a wide range of environmental issues. We are actively engaged around the world to promote science-based climate policies by working with regulatory, industry and other stakeholders, including joining advocacy groups and testifying before legislators and regulators*. We will continue

71

to work in partnership with others to advocate for tough, clear and enforceable regulations around the globe to address air and GHG emissions. In 2022, we were named to the S&P Dow Jones World and North American Sustainability Indices. It was the seventeenth consecutive time we were named to the North American index and the second time we were named to the world index since 2013. In 2021, we were named one of the inaugural recipients of the Terra Carta Seal by the Sustainable Markets Initiative, the effort founded by King Charles III while the Prince of Wales to recognize industry leaders in environmental sustainability. In addition, in 2022 we were awarded a gold medal for sustainability performance by EcoVadis, a globally collaborative platform for trading partners to share sustainability performance information.

We were named to Investor Business Daily's Best ESG Companies list for performance on environmental, social and governance matters, ranking number 27. We were also ranked number 47 among Barron's Top 100 Most Sustainable Companies.

202.    This statement was materially false and misleading when made because Cummins was not "addressing climate change and air emissions" given that illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks.

203.    The 2022 10-K contained the following statement on engine certification:

**Engine Certifications**

Our engines are certified globally through various categories within on-highway and off-highway applications. Regulations in these categories typically control nitrogen oxides (NOx), particulate matter (PM) and GHG. The current on-highway NOx and PM emission standards came into effect in India on April 1, 2020, (Bharat Stage VI), China on July 1, 2019, (National Standard NS VI), the European Union (EU) on January 1, 2013, (Euro VI) and on January 1, 2010, for the EPA. ***To meet these regulations, mid-range and heavy-duty engines for India, China, EU and EPA require NOx aftertreatment. NOx reduction is achieved by an integrated technology solution comprised of the XPI High Pressure Common Rail fuel system, SCR technology (in some cases), next-generation cooled EGR, advanced electronic controls, proven air handling and the Cummins Diesel Particulate Filter (DPF).*** The Ministry of Road Transport and Highways, Ministry of Ecology and Environment, EU, EPA and CARB certified that our engines meet the current emission requirements. Emission standards in international markets, including Japan, Mexico, Australia and Brazil are becoming more stringent. ***We believe that our experience in meeting the EU and EPA emission standards leaves us well positioned to take advantage of opportunities in these markets as the need for emission control capability grows***.

204.    The foregoing statement was materially false and misleading when made because Cummins' engines did not meet the EPA and CARB's certification standard since Cummins illegally installed defeat devices in 630,000 Model Year 2013-2019 RAM 2500 and RAM 3500 trucks and was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

205.    On May 2, 2023, August 3, 2023, and November 2, 2023 the Company filed with the SEC its quarterly reports on Form 10-Q for the periods ending March 31, 2023 (the "1Q23 Report"), June 30, 2023 (the "2Q23 Report") and September 30, 2023 (the "3Q23 Report") signed by Defendant Smith. Attached to the 1Q23, 2Q23 and 3Q23 Reports were certifications pursuant to SOX signed by Defendants Rumsey and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

206.    The 1Q23, 2Q23 and 3Q23 Reports contained the following risk disclosure:

***We are conducting a formal internal review of our emission certification process and compliance with emission standards with respect to our pick-up truck applications and are working with the Environmental Protection Agency (EPA) and California Air Resources Board (CARB) to address their questions about these applications. Due to the continuing nature of our formal internal review and on-going discussions with the EPA and CARB, we cannot predict the final results of this formal review and these regulatory processes, nor the extent to which, they likely will have a material adverse impact on the results of operations and cash flows.***

We previously announced that we are conducting a formal internal review of our emissions certification process and compliance with emission standards with respect to all of our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines for model year 2019 RAM 2500 and 3500 trucks. ***During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices***. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators'

requirements. ***Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018*** and Titan trucks for model years 2016 through 2019. ***Most recently, the regulators have also raised concerns regarding the completeness of our disclosures in our certification applications for RAM 2500 and 3500 trucks for model years 2013 through 2023***. We have also been in communication with Environmental and Climate Change Canada regarding similar issues relating to some of these very same platforms. ***In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. We accrued $30 million for the RAM recall during the first quarter of 2022, an amount that reflected our current estimate of the cost of that recall.*** We are also developing a new software calibration and hardware fix and will recall model years 2016 through 2019 Titan trucks. We accrued $29 million for the Titan recall during the third quarter of 2022, an amount that reflected our current estimate of the cost of that recall.

We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvements and seek to reach further resolutions as part of our ongoing commitment to compliance. ***Based upon our discussions to date with the regulators which are continuing, such resolutions may involve our agreeing to one or more consent decrees and paying civil penalties. Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters.*** The consequences resulting from our formal review and these regulatory processes likely will have a material adverse impact on our results of operations and cash flows, however we cannot yet reasonably estimate a loss or range of loss.

207.    The 1Q23, 2Q23 and 3Q23 Reports also contain statement under "**Legal Proceedings**" in Cummins consolidated financial statements:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the Environmental Protection Agency (EPA) and California Air Resources Board (CARB) regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors as we strive to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. ***During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control***

*systems and thereby act as defeat devices*. As a result, our internal review focuses, in part, on the regulators' concerns. *We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018* and Titan trucks for model years 2016 through 2019. *Most recently, the regulators have also raised concerns regarding the completeness of our disclosures in our certification applications for RAM 2500 and 3500 trucks for model years 2013 through 2023.* We have also been in communication with Environmental and Climate Change Canada regarding similar issues relating to some of these very same platforms. In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. *We accrued $30 million for the RAM recall during the first quarter of 2022, an amount that reflected our current estimate of the cost of that recall.* We are also developing a new software calibration and hardware fix and will recall model years 2016 through 2019 Titan trucks. We accrued $29 million for the Titan recall during the third quarter of 2022, an amount that reflected our current estimate of the cost of that recall.

We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvements and seek to reach further resolutions as part of our ongoing commitment to compliance. *Based upon our discussions to date with the regulators which are continuing, such resolutions may involve our agreeing to one or more consent decrees and paying civil penalties. Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters.* The consequences resulting from our formal review and these regulatory processes likely will have a material adverse impact on our results of operations and cash flows, however we cannot yet reasonably estimate a loss or range of loss.

208.    The two previous statements were materially false and misleading when made because it was reasonably possible Cummins would incur a loss as a result of the investigations and they failed to (i) fully disclose the nature of the loss contingency arising from violations of the Clean Air Act and (ii) provide a reasonable estimate of its loss or a range of loss (*see* Paragraphs 99-128).Given that (1) the Company had been conducting its own internal investigation since at least April 29, 2019, (2) EPA and CARB had informed Cummins that their

investigations concerned defeat devices installed in diesel engines, (3) Cummins had already developed and implemented a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks and was developing one for RAM 2500 and 3500 trucks for model years 2013 through 2018, indicating EPA told Cummins it believed the old AECDs were defeat devices, (4) regulators had turned their attention to other model years and other engines, including RAM 2500 and 3500 trucks for model years 2013 through 2018 and Cummins was planning to recall those trucks and had accrued $30 million for that purpose (5) Cummins responded to information requests from the DOJ and SEC, (6) the regulators have also raised concerns regarding the completeness of Cummins disclosures in our certification applications for RAM 2500 and 3500 trucks for model years 2013 through 2023, and (7) Cummins was aware that resolving the matter with regulators may involve agreeing to one or more consent decrees and paying civil penalties, it was at least reasonably possible that Cummins would be subject to a large penalty, in light of the earlier penalties paid by Volkswagen, Fiat Chrysler, and Daimler AG. Additionally, the statements portray Cummins cooperating with regulators even though Cummins was continuing to make engines for RAM 2500 and 3500 trucks with unlawful AECDs.

## ADDITIONAL SCIENTER ALLEGATIONS

### A. The Individual Defendants Were Put on Notice About NOx Emissions Violations by RAM 2500 and 3500 Trucks by the 2016 Consumer Class Action and that the EPA Was Taking Defeat Devices that Allowed Excess NOx Very Seriously by the Volkswagen and Other Settlements.

209.    Even before the EPA and CARB opened their investigations, Defendants were put on notice about NOx emissions violation by the engines of RAM 2500 and 3500 trucks because the plaintiffs in the 2016 Consumer Class Action conducted their own tests which showed excess NOx emissions (*see* Paragraph 52). Accordingly, Defendants were, at minimum reckless when they made statements that Cummins met emissions standards.

210. Additionally, the enormous $1.45 billion fine that Volkswagen paid in 2017 for using defeat devices to beat NOx emissions tests showed the importance of the issue to regulators (Paragraph 53) and should have been a huge red flag for Defendants. The large penalties that Fiat Chrysler and Daimler AG paid on January 10, 2019 and September 14, 2020 further confirmed this (Paragraphs 54-55).

211. Additionally, a shareholder proposal to let shareholders vote on bylaw amendments printed in Cummins' 2020 Proxy Statement, filed with the SEC on March 30, 2020, stated:

> Also a Dodge Ram emissions lawsuit went forward in 2019 after a federal judge upheld most claims related to Ram 2500 and 3500 diesel trucks that may be equipped with emissions defeat devices. *According to the lawsuit, Chrysler and Cummins colluded to manufacture and sell Ram trucks that meet federal emissions standards, but those standards were met only because the trucks were illegal. A Dodge Ram 2500 allegedly emitted 5.3 times beyond standards. Faking diesel emissions cost Volkswagen $20 billion.*

(emphasis added).

**B. Defendant Linebarger Showed Knowledge About the EPA/DOJ and CARB Investigations and Cummins' Emissions Compliance by Discussing them on Cummins Earnings Calls.**

212. During Cummins' earnings calls for the first, second, and third quarter of 2019 (on April 30, 2019, July 30, 2019, and October 29, 2019, respectively), Defendant Linebarger talked in detail about the progress and the EPA and CARB investigations, including that the investigations concerned defeat devices in RAM 2500 and 3500 trucks and that Cummins had developed a new emissions calibration for the 2019 model and implemented it. He also said the agency told Cummins to look into other model years and engines.

213. Additionally, during Cummins' First Quarter 2019 Earning Call, an analyst asked whether the "emissions certification process…could potentially impact your earnings for 2019"? and Defendant Linebarger responded:

> [W]e will work with urgency to get to the bottom of the questions that we got and to examine our certification and compliance processes. So ***we will be working with urgency to complete that review. And then, we also will be working quickly to implement those changes that we want to as a result of this review. So we'll work as quickly as we can, we'll quantify as quickly as we can, and we'll try to help people create a box around it as quickly as we can***.

(emphasis added).

214.    This shows that Linebarger was knowledgeable about the progress of the EPA and CARB's investigations and also about the progress of Cummins' internal investigations.

**C. Defendant Linebarger stated that Cummins Does its Own Emissions Tests and Submits The Data to EPA and CARB, Showing that Linebarger and the other Individual Defendants had Access to Cummins' NOx Emissions Data.**

215.    Linebarger further stated First Quarter 2019 Earning Call that ***Cummins does its own emissions tests and evaluations***:

> ***We do, do our own test and evaluations and we submit that data to the EPA and to CARB, who then do their own independent valuation, sometimes they do independent testing***. They always review the data we provide and then they provide us with the certification for those engines. And in the case of the 2019 RAM 2500 3500 engines, we have conditional certification from CARB and a similar kind of certification from the EPA. And so both of those are still under review.

(emphasis added).

216.    This shows that both Linebarger and the other Individual Defendants had access Cummins emissions data. Furthermore, it shows that Linebarger was aware he had access to the data and that the other Individual Defendants should, at minimum, should have been aware they had access to that data.

**D. The DOJ and CARB found that Cummins Knew or Should Have Known About the Defeat Devices in the in RAM 2500 and 3500 Trucks.**

217.    As discussed above, according to the DOJ Complaint the DOJ and EPA found that "Cummins ***knew or should have known*** that the undisclosed AECDs installed in the 2013-2019

RAMs were parts of those vehicles that were being offered for sale or installed for such use or put to such use." (emphasis added).

218.    Similar the CARB Complaint found that Cummins "***knew, or should have known***, that its statements of compliance in each of their applications for certification were inadequate regarding their compliance with California and federal emissions laws and regulations" and that Cummins' "***actions constitute multiple willful violations of California Vehicle Code § 27156***," which prohibits the sale of a "system that alters or modifies the original design or performance of the motor vehicle pollution control device or system." (emphasis added).

219.    Accordingly, this supports that Cummins and its top management acted with scienter.

**E. Defendants Smith and Rumsey Showed Their knowledge of the EPA and CARB Investigations by Their Comments on Cummins' May 2, 2023 Earning Call.**

220.    Defendant Smith gave an update on Cummins' First Quarter 2023 Earning Call, which took place on May 2, 2023, in which he stated that EPA and CARB were likely to propose to resolve their investigations in the near future by requesting that "Cummins agree to one or more consent decrees and pay certain civil penalties." Rumsey referenced Smith's comments later on the call and said: "we think that we are nearing the end." This shows that Smith and Rumsey were knowledgeable about the progress of the EPA and CARB's investigations and of Cummins' internal investigation.

**F. On the Same Day that DOJ announced the $1.675 Billion Dollar Penalty, Analysts Who Spoke with Cummins' Management Said that Cummins' Management Was Not Surprise by the Amount of the Settlement.**

221.    As discussed in Paragraphs 92-95, analysts who spoke with Cummins' management the day stated they were not surprised by the settlement amount: (1) the JP Morgan analyst report stated that the "settlement amount was within management's range of expectations"

and (2) the Evercore ISI analyst report stated that the "size [of the settlement] didn't necessarily surprise" Cummins' management.

222.    At the time of the settlement Defendant Rumsey was Cummins' CEO and Defendant Smith was Cummins CFO. Accordingly, it was a reasonable inference Defendants Rumsey and Smith intentionally or were, at minimum reckless, when they misleading investors by not providing a loss contingency for the DOJ/EPA and CARB investigations into RAM 2500 and 3500 trucks other than the $30 million dollar charge for the recall.

**G. Defendant Smith Oversaw Cummins Financial Statements.**

223.    Defendant Smith served as Cummins CFO almost the entire Class Period and signed every 10-K and 10-Q at issue and their SOX certifications other than the 2018 10-K. As CFO it was Defendant Smith's job to review and assess the accuracy of the Company's statements concerning investigations because they were part of Cummins' statements and consider whether the Company should disclose any loss contingencies. A minimal level of due diligence would have shown that Cummins initial decision to record no loss contingency and then a charge of only $30 million was misleading.

**H. There is a strong Inference of Corporate Scienter**

224.    Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Cummins, including each high-ranking officer or director, is imputable to the Company. The knowledge of each of these individuals should therefore be imputed to Cummins for the purposes of assessing corporate scienter.

225.    Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Cummins as an entity. Corporate scienter may be alleged independent of individual defendants where a statement is made or approved by a

corporate official sufficiently knowledgeable about the company to know the statement was false or misleading. Given the purported importance of emission compliance and the EPA/DOJ and CARB investigations to Cummins, the false and misleading statements alleged in this complaint would necessarily have required the approval of a corporate officer with knowledge that they were false and misleading.

## LOSS CAUSATION

226.    As discussed above, on December 22, 2023, before the market opened, the Company filed with the SEC a current report on Form 8-K in which it announced it expected to record a charge of approximately $2.04 billion in the fourth quarter of 2023 to resolve the DOJ/EPA and CARB investigations.

227.    Then, on the same day, the United States Department of Justice issued its press release stating that Cummins agreed to pay a *$1.675 billion* fine under the Clean Air Act and "allegedly installed defeat devices on 630,000 model year 2013 to 2019 RAM 2500 and 3500 pickup truck engines" and "installed undisclosed auxiliary emission control devices on 330,000 model year 2019 to 2023 RAM 2500 and 3500 pickup truck engines."

228.    On this news, the price of Cummins stock fell by $7.01 per share, or 2.87%, to close at $236.99 on December 22, 2023.

229.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

230.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NYSE during the Class Period, and

who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

231.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

232.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

233.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

234.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

235.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

236.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases

via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

237.    Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

238.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

239.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

240.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

241.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

242.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

243.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

244.    Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted

with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

245.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

246.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

247.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

248.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

249.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

250.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

251.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

252.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

253.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: April 25, 2025


**THE ROSEN LAW FIRM, P.A.**
*/s/ Brian B. Alexander*
Brian B. Alexander (*pro hac vice*)
275 Madison Avenue
40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: balexander@rosenlegal.com


*Lead Counsel for Lead Plaintiff and Class*

Eric S. Pavlack (SBN 21773-49)
Colin E. Flora (SBN 29914-49)
**PAVLACK LAW, LLC**
50 E. 91st St., Ste. 305
Indianapolis, IN 46240
Telephone: (317) 251-1100
Fax: (317) 252-0352
Email: Eric@PavlackLawFirm.com
Email: Colin@PavlackLawFirm.com

*Local Counsel for Lead Plaintiff and Class*